811 A.2d 414

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. MONICA L. FRISBY, DEFENDANT–APPELLANT.

Argued October 7, 2002—Decided December 11, 2002.

*Abby P. Schwartz,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Gerard C. Sims, Jr.,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

LONG, J.

Tried to a jury, Monica Frisby was found guilty of second degree endangering the welfare of a child, contrary to *N.J.S.A.* 2C:24–4(a), in connection with the death of her son, Ma'D. She was sentenced to a custodial term of seven years. Frisby appealed her conviction and the Appellate Division affirmed in an unreported decision. *State v. Frisby,* No. A–294–99T4 (App.Div. Oct. 3, 2001). We granted Frisby's petition for certification, 171 *N.J.* 444, 794 *A.*2d 183 (2002), in which she challenged the admission of prejudicial evidence at trial along with the adequacy of the trial court's jury unanimity instruction. We now reverse.

I

At trial, the following evidence was adduced in the State's case. On June 28, 1994, defendant Monica Frisby gave birth to a son, Ma'D. The child's father was Richard Patterson. From birth, Ma'D had special medical needs and the Division of Youth and Family Services (DYFS) intervened to assist Frisby with his medical care. There were no allegations of abuse or neglect against Patterson. However, because he was uncooperative with DYFS, Frisby was instructed not to leave Ma'D with him. On June 7, 1995, the DYFS caseworker, Theresa McNellis, visited Frisby and Ma'D at the motel where they resided. McNellis testified that she regularly saw Frisby at the motel over a seven-month period both on a scheduled and on an unscheduled basis. Prior to that date, DYFS had no record of neglect or abuse by Frisby. According to McNellis, the motel room was clean and the baby was properly attired. Frisby directed McNellis' attention to two minor scratches on the right side of the child's face and one on the left, which she attributed to an injury while the child was crawling. Frisby already had made a pediatrician's appointment to have the scratches looked at the following day.

With the exception of the scratches, McNellis saw no injuries whatsoever on Ma'D's head or face. However, she acknowledged that Ma'D had an old finger injury that he had sustained when he

caught his finger in a stroller and with respect to which he had received ongoing medical treatment. McNellis testified that the child appeared otherwise to be in good health, well cared for, and appropriately developed for his age.

On June 9, 1995, Detective Sergeant Bernard R. Buckley, of the Carney's Point Township Police Department, was involved in the investigation of Ma'D's death. Ma'D had been brought into Salem County Memorial Hospital on a call from the motel. The caller had indicated that the baby was unresponsive. Upon meeting with an investigator from the prosecutor's office, Buckley was informed that the baby was dead on arrival. In observing Ma'D's body, Buckley noted that the baby had a "long, narrow bruise on the ... left cheek and temple area and what appeared to be ligature marks ... around the wrist .... reflect[ing] that something had been placed on the wrist or was on the wrist snugly at some point." Buckley testified that the "ligature" marks were "not unusual" and a prosecutor's investigator, Leroy Pierce, testified that they were consistent with "clothing that is often worn by infants."

The prosecutor's investigator introduced Buckley to Monica Frisby. Frisby was not a suspect at that time and willingly talked to Buckley. Frisby told the detective that on June 8, she was in her motel room with the baby and Patterson, the baby's father. They all had gone out to visit friends and relatives and returned to the room at about 5:00 p.m. She stated that she asked Patterson to watch Ma'D because she wanted to go into Penns Grove for the evening. According to Buckley, Frisby said she left the baby with Patterson at about 7:00 p.m. Frisby told Buckley that at about 11:30 p.m. she saw Patterson in Penns Grove and confronted him "as to why he wasn't in the room with the child." Frisby said that as soon as she realized that the baby was alone, she immediately tried to get a ride back to the motel. She was finally able to obtain a ride from a man named Tony and arrived at the motel around 1:30 a.m. Frisby said that, at first, she thought that the baby was asleep in the crib. She then observed mucus around his

nose and when she checked more closely, she found that he was not breathing. She tried to get help from a friend in the motel, called 911, and performed CPR. When questioned by Buckley about the bruises on the baby's face, Frisby indicated that he had fallen off the bed the previous day and had hit himself on a bicycle.

Frisby was taken to headquarters where she signed a consent to search her motel room. The detective did not find a bicycle in the room. However, Frisby indicated that she had used the bicycle to get to Penns Grove and left it there while she sought a ride home. Patterson later confirmed the presence of the bicycle in Penns Grove.

Frisby was released from headquarters while the detective conducted his investigation. At that point, Buckley initiated contact with Patterson regarding Frisby's claim that she had left Ma'D with him. According to Buckley, Patterson told him that he was not supposed to, nor did he, watch the baby that night. He recounted where he had been during the course of the evening. Buckley testified that he wanted to "substantiate [Patterson's] claims that he had been at certain places at certain times as opposed to what Ms. Frisby had told us that he was supposed to be at the motel room at these times." According to Buckley, after speaking to Patterson's "witnesses," no charges were brought against him because his witnesses "appeared to substantiate his claims about his whereabouts that evening."

Patterson testified that Ma'D was his son and that on June 8, 1995, he saw Frisby and the baby coming out of a neighbor's house and gave them a ride back to the motel. He kissed the baby good-bye and left. The following morning, Patterson was at work when the police came to talk to him. It was at that point that he was told that the baby was dead. He voluntarily accompanied a police sergeant to the police station where Buckley and Investigator Anthony Rastelli, of the Salem County Prosecutor's Office, questioned him. In response to their questioning, Patterson outlined all of the places he had been and all of the people he

had seen on the previous night. Among them were his sister, his brother-in-law, his nephew, his nephew's wife, and a cousin. Patterson indicated that he had seen Frisby on three occasions that night. He saw her at about 9:00 p.m. as she went into a woman's house in Penns Grove where she parked her bicycle on the curb. He saw her again at about 10:00 p.m. on the street. Patterson said he asked her where the baby was and Frisby said something "nasty" to him. He said he then saw Frisby a third time, about midnight, when she asked him for a ride back to the motel. Patterson knew that Ma'D was not with Frisby at any point that night and did not know who was watching him. After Patterson got home that night, he said that Frisby called him twice. "The first time she called she said, 'Richie,' . . . 'Why'd you leave?' And I said, 'What you talking about,' and she just hung up the phone like that, and the second time she called, she said, 'Richie, Ma'D's dead,' and she hung the phone up." Patterson said he did not take those calls seriously.

Investigator Rastelli also interviewed Patterson and some of the people that Patterson indicated that he had seen between 8:00 p.m. and 1:00 a.m. on the night Ma'D died. According to Rastelli, after the investigation the police decided not to charge Patterson with endangering the welfare of the child. Rastelli testified that was because "[w]e didn't feel that there was enough evidence, that he was more credible than Ms. Frisby at that point."

Dr. Paul Reyes was the emergency room doctor on the night Ma'D died. He attempted to treat Ma'D when he was brought into the emergency room but indicated that he basically was dead on arrival. Dr. Reyes observed a bruise on Ma'D's face that caused him to become suspicious that there had been some type of abuse. The doctor also testified that Ma'D might have been sick prior to his death as he was warm, indicating that he had had a fever.

Dr. Paul J. Hoyer, the medical examiner/designated pathologist of Salem County, conducted the autopsy on Ma'D on June 9. Dr. Hoyer observed four injuries on Ma'D: a small bruise on the left

side of the forehead; a larger bruise on the left side of the face; a bruise on the right side of the head above the ear; and an irregularity of a finger on the left hand. Hoyer indicated that those injuries occurred at three separate times. The injuries on the forehead and right side of the head were less than twelve hours old and the larger bruise on the left side of the face was approximately a day old. The finger injury was two months old or more because it had completely healed. Regarding the marks on the wrists and ankles, the doctor opined that they could have come from the sleeper or from the baby having been bound. He could not be sure. The doctor testified that, in his opinion, Ma'D had been the victim of child abuse. Frisby did not testify and called no witnesses on her behalf.

The State offered alternative theories against Frisby: (1) that she actually inflicted the injuries on Ma'D or failed to supervise him adequately thus resulting in his injury and (2) that she abandoned him. On the evidence, the jury convicted Frisby of endangering the welfare of a child. This appeal followed.

## II

We turn first to Frisby's contention that the hearsay testimony proffered by the State improperly struck at the heart of her defense—that she had left the baby in Patterson's care. Because no objection was advanced with respect to that hearsay evidence at trial, it must be judged under the plain-error standard: that is, whether its admission "is of such a nature as to have been clearly capable of producing an unjust result." *R.* 2:10–2; *State v. Macon,* 57 *N.J.* 325, 335, 273 *A.*2d 1 (1971).

Specifically, Frisby challenges the testimony of Detective Buckley and Investigator Rastelli to the effect that Patterson's testimony was "substantiated" by the witnesses who told the police they were with him at various locations on the night in question. As indicated, Detective Buckley stated that: "We wanted to substantiate his claims that he had been at certain places at certain times as opposed to what Ms. Frisby had told us that he

was supposed to be at the motel room at these times." Buckley concluded that: "Because of the interviews with the persons he had mentioned. It appeared to substantiate his claims about his whereabouts that evening, and there was no—not enough information for us to charge him with anything." Frisby also challenges Investigator Rastelli's testimony that after interviewing his family and friends, Patterson was not charged because the police "didn't feel that there was enough evidence, that he was more credible than Ms. Frisby at that point." In sum, Frisby submits that the trial was tainted by inadmissible evidence and that she was prejudiced by the statements bolstering Patterson's credibility. We agree.

The officers' testimony was problematic from many perspectives. In essence, it recounted out-of-court statements of non-testifying witnesses to prove the truth of the matter asserted (that they were with Patterson at various locations other than the motel room on the night of Ma'D's death). That testimony contravened *N.J.R.E.* 802, which interdicts hearsay except as provided by the Rules of Evidence or other law.

The State argues that *State v. Bankston,* 63 *N.J.* 263, 307 *A.*2d 65 (1973), is "other law" that authorized the officers to explain why they chose to prosecute Frisby and not Patterson. That is a gross overstatement of the holding of *Bankston.* To be sure, there are circumstances in which an officer will be allowed to testify, based generally on hearsay evidence, to explain the course of his or her investigation. *State v. Roach,* 146 *N.J.* 208, 224–25, 680 *A.*2d 634, *cert. denied,* 519 *U.S.* 1021, 117 *S.Ct.* 540, 136 *L.Ed.*2d 424 (1996). For example, an officer might explain that he received information that caused him to approach a suspect or brought him to the scene of a crime. *Bankston, supra,* 63 *N.J.* at 268, 307 *A.*2d 65. However, "when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused, the testimony violates the hearsay rule" and implicates defendant's Sixth Amendment confrontation rights. *Ibid.* (citations omitted). To the extent that Detective Buckley

and Investigator Rastelli stated that the absent witnesses "substantiated" Patterson's testimony, they simply used a shorthand method of providing the detail interdicted by the hearsay rule and in so doing, "irresistibly" implicated Frisby. *Roach, supra,* 146 *N.J.* at 225, 680 *A.*2d 634 (citing *State v. Thomas,* 168 *N.J.Super.* 10, 15, 401 *A.*2d 693 (App.Div.1979)).

Another problem with the officers' testimony was overbreadth. Patterson's alibi witnesses only shed light on where he actually was on the night Ma'D died and not on where he was supposed to be. The crux of this case was whether Patterson promised Frisby that he would care for Ma'D. She told the police that he did. He told them that he did not. The alibi witnesses had no information whatsoever on that pivotal issue. Yet, the officers broadly concluded that they "substantiated" Patterson's story and made him "more credible" than Frisby. That was incorrect as a factual matter. The witnesses only substantiated Patterson's actual absence from the motel, a subject that Frisby did not contest.

■ The State argues that the hearsay testimony was irrelevant to the ultimate issue of whether Patterson had promised Frisby that he would care for Ma'D, and that therefore any error in admitting it was harmless. Not so. First, the jurors were never alerted to the fact that the witnesses did not substantiate Patterson on the core issue in the case—where he was supposed to be. Although the jurors might have recognized that the out-of-court witnesses could not possibly attest to what happened in the early evening hours between Frisby and Patterson at the motel, from the officers' testimony the jurors could have concluded that those witnesses substantiated Patterson's claim that he saw Frisby three times on the night of Ma'D's death. If they believed that, the rest of Frisby's story that she only saw Patterson once and immediately headed for home was eviscerated.

Most important, the hearsay testimony was advanced by the officers as the foundation for their wholly improper credibility evaluation in favor of Patterson and against Frisby. Based on the hearsay evidence, the police essentially gave the jury their opinion

regarding the innocence of Patterson and inferentially the guilt of Frisby. That is not allowed.

Indeed, in *State v. Hightower*, 120 *N.J.* 378, 426, 577 *A.2d* 99 (1990), Justice Handler explained why we disapprove of the testimony of a police officer that expresses an opinion of defendant's guilt:

> We go to extraordinary lengths in ordinary criminal cases to preserve the integrity and neutrality of jury deliberations, to avoid inadvertently encouraging a jury prematurely to think of a defendant as guilty, to assure the complete opportunity of the jury alone to determine guilt, to prevent the court or the State from expressing an opinion of defendant's guilt, and to require the jury to determine under proper charges no matter how obvious guilt may be. A failure to abide by and honor these strictures fatally weakens the role of the jury, depriving a defendant of the right to trial by jury.
>
> [*Id.* at 427–28, 577 *A.2d* 99 (Handler, J., concurring in part and dissenting in part) (citations omitted).]

*See also State v. Odom*, 116 *N.J.* 65, 77, 560 *A.2d* 1198 (1989) (holding that expert testimony opining on defendant's guilt wholly improper because criminal guilt or innocence is jury's exclusive responsibility); *State v. Landeros*, 20 *N.J.* 69, 74–75, 118 *A.2d* 521 (1955) (holding that police captain's testimony regarding defendant's guilt was so prejudicial that it warranted reversal of defendant's conviction).

▮▮▮ The State argues that the officers' testimony regarding Patterson's credibility was not a commentary on guilt as interdicted by *Bankston*. On the contrary, like the testimony ruled improper in *Roach, supra*, it implicated Frisby by "necessary inference." 146 *N.J.* at 224, 680 *A.2d* 634. Moreover, the mere assessment of another witness's credibility is prohibited. In *State v. J.Q.*, the Appellate Division spoke directly to this issue in the context of expert opinion:

> The question of whether a particular witness is testifying in a truthful manner is one that must be answered in reliance upon inferences drawn from the ordinary experiences of life and common knowledge as to the natural tendencies of human nature, as well as upon observations of the demeanor and character of the witness. The phenomenon of lying, and situations in which prevarications might be expected to occur, have traditionally been regarded as within the ordinary facility of jurors to assess. For this reason, the question of a witness' credibility has routinely been regarded as a decision reserved exclusively for the jury.

It is an encroachment upon the province of the jury to permit admission of expert testimony on the issue of a witness' credibility.

[252 *N.J.Super.* 11, 39, 599 *A.*2d 172 (App.Div.1991) (quoting *Commonwealth v. Seese*, 512 *Pa.* 439, 517 *A.*2d 920, 922 (1986)), *aff'd*, 130 *N.J.* 554, 617 *A.*2d 1196 (1993).]

As the Appellate Division concluded, "credibility is an issue which is peculiarly within the jury's ken and with respect to which ordinarily jurors require no expert assistance." *Ibid.*

Likewise, in *State v. Pasterick*, 285 *N.J.Super.* 607, 620, 667 *A.*2d 1103 (App.Div.1995), the Appellate Division noted: "There is no provision in our legal system for a 'truth-teller' who is authorized to advise the jury on the basis of *ex parte* investigations what the facts are and that the defendant's story is a lie." In *Pasterick*, the lack of objection by defense counsel to the expert's testimony was of no consequence. *Id.* at 621, 667 *A.*2d 1103. As noted by that court, "although not objected to, we hold that it was plain error *because it deprived defendant of his right to a fair trial.*" *Id.* at 622, 667 *A.*2d 1103 (emphasis added) (citations omitted).

We think the admission of the challenged testimony of Detective Buckley and Investigator Rastelli constituted plain error. First, they recounted the out-of-court statements of non-testifying witnesses in contravention of our hearsay rules. Second, the officers told the jury outright that those statements "substantiated" Patterson's testimony when, in fact, they had absolutely no bearing whatsoever on the pivotal issue of whether Patterson had promised Frisby that he would care for Ma'D. Third, officer Rastelli testified that Patterson was "more credible" than Frisby when that was the ultimate question for the jury. The effect of the police testimony essentially vouching for Patterson cannot be overstated. As we recently observed in *Neno v. Clinton*, 167 *N.J.* 573, 586–87, 772 *A.*2d 899 (2001), in connection with a police witness's testimony about fault for an automobile accident:

A jury may be inclined to accord special respect to such a witness. Deference to a police officer in turn may have enhanced the credibility of the statements of Burnett and Meyer. It is safe to say that Officer Kelly's testimony created improper bolstering.... The jury heard from a law enforcement officer trained in

accident investigation that he believed plaintiffs caused the accident. The jury could have ascribed almost determinative significance to that opinion, which went to the heart of the case.

This case was a pitched credibility battle between Frisby and Patterson on the pivotal issue of whether Patterson promised to care for Ma'D. Any improper influence on the jury that could have tipped the credibility scale was necessarily harmful and warrants reversal.

## III

We turn next to Frisby's claims regarding the jury instruction on unanimity. The unanimity principle is deeply ingrained in our jurisprudence:

Like the "reasonable doubt" standard that was found to be an indispensable element at all criminal trials in *In re Winship,* 397 *U.S.* 358, 364, 90 *S.Ct.* 1068, 1072, 25 *L.Ed.*2d 368, 375 (1970), "the unanimous jury requirement 'impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue.'" *United States v. Gipson,* 553 *F.*2d 453, 457 (5th Cir.1977) (quoting *In re Winship, supra,* 397 *U.S.* at 364, 90 *S.Ct.* at 1072, 25 *L.Ed.*2d at 375). Our Constitution presupposes a requirement of a unanimous jury verdict in criminal cases. *N.J. Const.* art. I, [¶] 9. Our Rules require that the "verdict shall be unanimous in all criminal actions." *R.* 1:8–9.

[*State v. Parker,* 124 *N.J.* 628, 633, 592 *A.*2d 228 (1991), *cert. denied,* 503 *U.S.* 939, 112 *S.Ct.* 1483, 117 *L.Ed.*2d 625 (1992).]

The notion of unanimity requires "jurors to be in substantial agreement as to just what a defendant did" before determining his or her guilt or innocence. *Gipson, supra,* 553 *F.*2d at 457. "Requiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless the prerequisite of jury consensus as to the defendant's course of action is also required." *Id.* at 458 (footnote omitted).

Although the need for juror unanimity is obvious, exactly how it plays out in individual cases is more complicated. For example, it has been held that a jury does not have to agree unanimously on whether a defendant has acted as a principal or an accomplice. *United States v. Peterson,* 768 *F.*2d 64 (2d Cir.) (finding that jury unanimity regarding whether defendant aided or abetted in drug distribution crime not required for purposes of determining if

defendant was statutory principal), *cert. denied,* 474 *U.S.* 923, 106 *S.Ct.* 257, 88 *L.Ed.*2d 264 (1985). It has also been held that unanimity is not required when a statute embodies a single offense that may be committed in a number of cognate ways. *United States v. UCO Oil Co.,* 546 *F.*2d 833 (9th Cir.1976) (determining that jury unanimity on specifics not required in conviction for making false statements and concealing material fact by trick, scheme, or device in relation to gasoline service station business), *cert. denied,* 430 *U.S.* 966, 97 *S.Ct.* 1646, 52 *L.Ed.*2d 357 (1977); *see generally* Tim A. Thomas, J.D., Annotation, *Requirement of Jury Unanimity as to Mode of Committing Crime Under Statute Setting Forth the Various Modes by Which Offense May Be Committed,* 75 *A.L.R.*4th 91 (1990).

It is clear, however, that there are some circumstances in which a general unanimity charge will be inadequate. In *Parker, supra,* we gave examples of such circumstances,

"[when] a single crime can be proven by different theories based on different acts and at least two of these theories rely on different evidence, and [when] the circumstances demonstrate a reasonable possibility that a juror will find one theory proven and the other not proven but that all of the jurors will not agree on the same theory." *People v. Melendez,* 224 *Cal.App.*3d 1420, 1433–34, 274 *Cal.Rptr.* 599, 608 (1990). . . . *[S]ee also United States v. Payseno,* 782 *F.*2d 832, 836 (9th Cir.1986) (" '[When] there is *a genuine possibility of jury confusion* or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice.' " (quoting *United States v. Echeverry,* 719 *F.*2d 974, 975 (9th Cir.1983))). . . . "[W]here the facts are exceptionally complex, *see Payseno,* [*supra,*] 782 *F.*2d at 836–37, or where the allegations in a single count are either contradictory or only marginally related to one another, *id.,* or where there is a variance between the indictment and the proof at trial, *United States v. Echeverry,* 698 *F.*2d 375, 377, *modified,* 719 *F.*2d 974 (9th Cir.1983), *United States v. Mastelotto,* 717 *F.*2d 1238, 1250 (9th Cir.1983), or where there is a tangible indication of jury confusion. *Echeverry,* [*supra,*] 698 *F.*2d `at 376–77. In these instances, the trial court must give an augmented unanimity instruction." [*United States v. Ryan,* 828 *F.*2d 1010, 1020 (3d Cir.1987).]

[124 *N.J.* at 635–36, 592 *A.*2d 228.]

We concluded:

Concerning the need for a specific unanimity instruction, we agree with the proposition stated in *North I* that is generally applied in the federal system: "in cases where there is a danger of a fragmented verdict the trial court must upon

request offer a specific unanimity instruction." *North I, supra,* 910 *F.*2d at 875; *accord United States v. Ryan, supra,* 828 *F.*2d 1010; *United States v. Mangieri,* 694 *F.*2d 1270 (D.C.Cir.1982).

[*Id.* at 637, 592 *A.*2d 228.]

Because we adjudicate this claim under the plain-error standard, the issue is whether the failure of the trial court to give a specific unanimity instruction *sua sponte* was clearly capable of producing an unjust result. *R.* 2:10–2. This is not a case in which the jury charge was incorrect on its face. *See, e.g., State v. Robinson,* 165 *N.J.* 32, 40, 754 *A.*2d 1153 (2000) (explaining that failure to provide "proper jury instructions" may constitute plain error). The charge was correct as far as it went. The fundamental issue is whether a more specific instruction was required in order to avert the possibility of a fragmented verdict. We think it was.

This case embodies the very circumstances to which we adverted in *Parker* as warranting a specific unanimity instruction. Endangering the welfare of a child, *N.J.S.A.* 2C:24–4(a), has three elements: that the victim was a child; that defendant had a duty to care for him; and that defendant knowingly caused him harm, making him an abused or neglected child. The State proffered two theories to undergird its case. The first was that Frisby either inflicted the injury upon Ma'D or failed to supervise him, resulting in the injury. The second was that she abandoned him in the motel room.

In instructing the jury on those theories, the trial court stated:

What is in contention is the third element. Remember that the third element is that [defendant] knowingly caused Ma'D harm that would make Ma'D an abused or neglected child. I've just told you what knowingly is, and with regards to whether Ma'D was an abused or neglected child, the State makes two separate contentions, and I've read you those legal definitions, but I would suggest that for the first the State contends that [defendant] inflicted the injuries to Ma'D's head as described by Dr. Hoyer this morning or that she failed to properly supervise Ma'D resulting in the injuries to his head. [Defendant] denies inflicting any injury on Ma'D or failing to properly supervise him. The second possible prong for the third element is where the State contends that [defendant] abandoned Ma'D on the—in the early—I'm sorry—on the evening of June 8th, 1995 while she went into Penns Grove. [Defendant] asserts that she did not abandon Ma'D and that she left him in the care of Richard Patterson. *For the State to meet the burden of proof on the*

*third element, they must prove to you beyond a reasonable doubt that either of the
two exists.* They do not have to prove both of them. So if you're convinced
beyond a reasonable doubt that the State has proved its contentions with regards
to [defendant] inflicting injuries on Ma'D or not—or failing to supervise him so that
the injuries resulted, that's sufficient, *or* if you find that [defendant] abandoned
Ma'D on the evening of June 8th, 1995, or—I'm sorry—not or. If you find that she
abandoned him, that would meet the third prong. The State does not have to
prove both contentions. They're alternate co—alternate arguments made by the
State. Ladies and gentlemen, if you find that the State has proven all three
elements, age, duty, and what occurred, then you must find the defendant—I'm
sorry—proved all three elements beyond a reasonable doubt, then you must find
the defendant guilty. If you find that the State has failed to prove any of the three
elements; and in this case, it would be the third one, either of the two alternate
arguments, then you must find the defendant not guilty.
[ (Emphasis added).]

The court also gave a general unanimity instruction later in the
charge:

The verdict must represent the considered judgment of each juror and must be
unanimous as to the charge. This means that all of you must agree if the
defendant is guilty or not guilty on the charge of endangering the welfare of a
child.... Since this is a criminal case, your verdict, whatever it may be, must be
unanimous. That means that all 12 who ultimately are chosen as a deliberating
jury must agree as to the verdict.

▋ Frisby contends that the unanimity aspects of the instruc-
tion were fashioned in such a way as to allow a non-unanimous
patchwork verdict against her. More particularly, because the
state proffered two entirely distinct factual scenarios to support
the third element of the crime of endangering, Frisby contends
that the jurors may have convicted her although some believed she
was at the motel when the injuries were sustained while others
believed she abandoned Ma'D for a night on the town.

We agree with Frisby. Different theories were advanced based
on different acts and entirely different evidence. In one scenario,
Frisby was present and inflicted the injuries on Ma'D or allowed
him to be injured. In the other, she went out and left him alone.
Those are unlike the facts deemed cognate in *Parker,* *supra,*
where the defendant showed the child victims pornography, in-
formed them of her sexual desires, and used foul language, which
acts the Court held to be "conceptually similar." 124 *N.J.* at 639,
592 *A.2d* 228. Nor are they like the facts in *State v. T.C.,* 347

*N.J.Super.* 219, 789 *A.*2d 173 (App.Div.2002) (petition for certification pending), where the Appellate Division held that different sadistic acts toward a child victim including hitting, verbal abuse, starvation, and humiliation did not require a specific unanimity charge because there was a single theory of ongoing emotional and physical abuse advanced and the acts alleged were conceptually similar.

On the contrary, the allegations in this case were "contradictory," "conceptually distinct," and not even "marginally related" to each other, thus requiring a specific unanimity instruction. *Cf. Parker, supra,* 124 *N.J.* at 639, 592 *A.*2d 228 (finding that defendant's acts were conceptually similar thus obviating need for specific unanimity charge). A jury verdict form could have clarified matters but was not used. Courts should remain alert to the necessity of tailoring jury instructions to the facts and of utilizing a specific unanimity charge in any case in which the danger of a fragmented verdict is even reasonably debatable.

We note that the State contends that because there was no evidence of "jury confusion" a reversal is not required. That argument dices the notion of jury confusion referred to in our unanimity case law too finely. To be sure, if a jury affirmatively evidences "confusion" by its questions or its answers on a jury verdict form, that would be an important factor in determining whether the absence of a specific unanimity charge caused defendant to be prejudiced. But the converse does not follow. As a result of the absence of a specific unanimity charge, the jurors here may have been perfectly clear that they could convict Frisby although they completely disagreed regarding contradictory and conceptually distinct theories and the evidence underlying them. That is especially true in light of the court's instruction that to convict the State had to prove "either" of its theories beyond a reasonable doubt. Such a jury would "evidence" no confusion but would nevertheless meet the confusion standard in the cases.

## IV

The judgment of the Appellate Division is reversed. The matter is remanded for retrial to take place in accordance with the principles to which we have adverted.

*For reversal and remandment*—Chief Justice PORITZ, and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI and ALBIN—7.

*Opposed*—None.