# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5484-17T3

STATE OF NEW JERSEY
IN THE INTEREST OF F.W.,

a Juvenile.

_____

Submitted January 6, 2020 – Decided July 24, 2020

Before Judges Ostrer and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FJ-20-0191-18.

Joseph E. Krakora, Public Defender, attorney for appellant F.W. (Janet Anne Allegro, Designated Counsel, on the brief).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent State of New Jersey (Michele C. Buckley, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

F.W. (Frank), a juvenile, appeals from an adjudication of delinquency for conduct that, if committed by an adult, would constitute second-degree sexual

assault, N.J.S.A. 2C:14-2(b); third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1); and fourth-degree lewdness, 2C:14-4(b)(1).[1] The charges arose out of an incident between Frank and a six-year-old girl, A.W. (Ashley), in August 2017. On appeal, Frank contends the trial court erred in admitting Ashley's statement to the police because it was untrustworthy. He also asserts the prosecutor committed reversible error by asking Frank whether one of the State's witnesses had any reason to lie about Frank's whereabouts on the day of the assault. Frank also alleges the trial court erred in finding there was sufficient evidence to support the court's adjudication of delinquency, and that the trial court imposed an excessive sentence. We find no reversible error and affirm.

## I.

The State presented its case through testimony of the victim, her mother, her relative who witnessed the assault, a boy who had been with Frank earlier that day, and the detective who interviewed the victim. The State also introduced Ashley's prior statements to the detective and to her mother. Frank, his mother, and his aunt, testified in his defense.

---

[1] In accord with Rule 1:38-3(c)(9), we use initials and pseudonyms.

A-5484-17T3

On August 1, 2017, around 5:00 p.m., Ashley was waiting outside her house while her mother, Helen, changed out of her work clothes so she could drive Ashley to cheerleading practice. Ashley was talking to her friend, who then left. Ashley then saw a group of boys from the neighborhood, including her friend Thomas, walk by her house.

Thomas testified that he and a group of boys, including Frank, then twelve years old, had decided to buy some snacks and drinks at a corner store. Thomas needed to go to his mother's house to get money. Frank broke off from the group before Thomas and the others walked past Ashley's house. Thomas saw her playing out front.

Ashley testified that while playing in front of her house, alone, a boy she had never spoken to before approached her. She only knew him as "Aaron's brother." At trial, the parties stipulated Frank and Aaron are brothers. The boy, who Ashley later identified as Frank, asked her for some water, and she obliged. Ashley also noted that the boy had a red, white, and blue basketball.

Ashley and Frank then walked towards the back of her house. Frank asked Ashley if she had a "fake boyfriend," to which she replied "no"; then, Frank approached her and touched her over her clothes. She indicated on an anatomical drawing that he touched her on the buttocks and vagina. After Frank

touched Ashley, he pulled his pants down and "was wiggling his penis" with two hands.

Steven, Ashley's cousin, was in the back of the house next door, talking on the phone when he saw a boy with Ashley; the boy "had his private parts in his hand," outside of his clothing, and with his other hand was "digging in between [Ashley's] legs." Steven "screamed at him, whatcha doing?" Frank fled, basketball in hand. Steven testified he never saw Frank's face. Rather, he described a boy wearing a white t-shirt and green shorts.

Thomas testified that after Frank had gone his separate way, the group went to the store, and then to a group-member's house. While they were sitting there together, Thomas saw Frank running out of the backyard. Since Frank was running fast, Thomas thought Frank was playing tag with someone. Thomas testified Frank was wearing green shorts. Just a few minutes later, Helen and Steven came across Thomas and asked him where Frank lived. He directed them there, but they did not immediately find him.

Helen brought along a teenaged relative, Zach, who knew the boys from the neighborhood. They went looking in the neighborhood for "Aaron's brother" a few times, but were unable to find him.

A-5484-17T3

Helen eventually came across Frank's aunt in the street, who then called Frank's mother and told her to "come outside [be]cause Helen is saying that Frank did something." As Ashley's mother questioned Frank's whereabouts, he approached them wearing black shorts and a black shirt. Upon approaching the group, Frank "threw his hands up, he said, wait, what happened, I didn't do anything," which he asserted was in response to hearing someone say, "oh, that's him right there."

When Frank arrived, Helen asked Ashley if Frank was the boy she was with at the house. Helen testified that Ashley initially, "shook her head yes. I said use your words and she said yes and he said no I didn't, no I didn't. . . . " However, Helen also testified that when she asked Ashley if Frank was the person involved in the prior incident, as Frank stood before her, Ashley "just kept shrugging her shoulders and not using her words." So, she "got very upset" and "hit her." After that, Ashley "used[d] . . . words," and "said yes, it was him and [Ashley] started crying."

Frank's mother testified that he approached her as he headed home in the afternoon. He hugged her, and she told him he smelled "a little musty," and should go inside and take a shower. This, she said, was why he went home, changed out of his white t-shirt and light gray shorts, and put on black shorts

and a black shirt. Frank's mother and Frank's aunt both testified that Ashley said that Frank was not the one who assaulted her, when she first confronted Frank outside the aunt's home. Both women testified that Helen reacted by hitting Ashley so hard she fell to the ground. Frank's mother said that Helen then lifted Ashley up by her braids, and only after additional prompting from Helen did Ashley reverse herself.

Frank corroborated his mother's testimony about his attire. He denied interacting with Ashley, although he stated that he "might have" walked past her house. He also denied hanging out with Thomas during the day, and denied running through a friend's backyard. He gave an alternative account of his whereabouts during the afternoon. He admitted he owned a red, white, and blue basketball, but he asserted it is a popular basketball and "everyone" owns one, although he denied having any basketball with him on the day in question.

In an oral decision, the trial judge found "the State proved its . . . case beyond a reasonable doubt." The trial judge found the victim and the State's witnesses to be credible. In contrast, he found Frank was "evasive," not credible, and his version of events did not "hold together." He found implausible the account of Frank's mother and aunt that Helen hit Ashley to the ground.

A-5484-17T3

The trial judge merged fourth-degree lewdness and third-degree endangering into the second-degree sexual assault count. After discussing the relevant aggravating and mitigating factors, the trial judge sentenced Frank to 36 months of probation, Special Caseload, and ordered him "to comply with all recommendations of the 14-day plan, all After-Care provided including attending [a] Juvenile Sex Offender Program." The trial judge also ordered Frank register under Megan's Law, and noted that since Frank committed the crime when he was under the age of 14, he can apply to have his registration terminated upon turning 18. See In re Registrant J.G., 169 N.J. 304 (2001).

On appeal, Frank presents the following points for our consideration:

POINT I

THE TRIAL COURT ERRED IN ADMITTING THE CHILD'S STATEMENT TO THE POLICE PURSUANT TO N.J.R.E. 803(c)(27) AS THE STATEMENT WAS NOT TRUSTWORTHY.

POINT II

THE PROSECUTOR COMMITTED MISCONDUCT AND F.W. WAS DEPRIVED OF HIS RIGHT TO A [] FAIR TRIAL WHEN THE PROSECUTOR ASKED HIM WHETHER A STATE'S WITNESS HAD ANY REASON TO LIE (NOT RAISED BELOW).

A-5484-17T3

POINT III

THE COURT'S FINDING OF DELINQUENCY IS NOT SUPPORTED BY SUFFICIENT CREDIBLE EVIDENCE IN THE RECORD AND MUST THEREFORE BE REVERSED.

POINT IV

THE STATE FAILED TO PROVE THE REQUIRED ELEMENTS OF THE FIRST AND THIRD COUNT[S] OF THE COMPLAINT (NOT RAISED BELOW).

POINT V

THE SENTENCE IMPOSED BY THE COURT WAS EXCESSIVE.

## II.

We consider first Frank's contention that Ashley's statement to the detective should have been excluded as not trustworthy. At a Rule 104 hearing, Detective Brian O'Malley, of the Union County Prosecutor's Office Special Victims Unit, testified that he interviewed Ashley the day after the incident.[2] O'Malley had received special training for interviewing children under thirteen. O'Malley interviewed Ashley alone in a room, and the interview was videotaped.

---

[2] The detective testified only at an N.J.R.E. 104 hearing in support of the State's application to admit Ashley's recorded statement. However, to avoid repetition, the court granted the State's request to also consider the detective's testimony as if given in the State's case in chief.

A-5484-17T3

During the interview, Ashley indicated she knew why she was speaking with the detective that day – "[b]ecause something happened bad [sic] yesterday," namely, "a 12 year old was sticking his thing out . . . in the back of [her] house." Ashley identified the assailant by name, Frank, and also recounted the events leading up to the assault. Ashley noted that Frank approached her, asked her to touch his "thing," which she refused, and Frank then began "wiggling it . . . with his hands." Ashley was reticent to use words to describe private areas of the body, since she didn't "want to get in trouble." Ashley also identified Frank as wearing green shorts and a white t-shirt.

The court found Ashley's statement to O'Malley to be sufficiently trustworthy and admissible under N.J.R.E. 803(c)(27).[3] The court heard testimony from O'Malley and Ashley's mother, and viewed the videotaped interview. Noting that Ashley was available to testify, the court made its finding based on the "totality of the circumstances," including "the time the statements were made, [and] the circumstances that they were made . . . ."

Under N.J.R.E. 803(c)(27), "[a] statement by a child under the age of 12 relating to sexual misconduct committed with or against that child is admissible

---

[3] The court also held, after an N.J.R.E. 104 hearing, that Ashley's statement to her mother, immediately after Steven reported the incident, was admissible. Defendant does not challenge that ruling on appeal.

in a criminal, juvenile, or civil case" so long as (a) opposing counsel is given notice that the statement will be used; (b) the court holds a Rule 104(a) hearing to determine "on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy"; and (c) "the child testifies at the proceeding," or "the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse."[4]

As the proponent of the hearsay, the State bears the burden to satisfy the Rule's prerequisites and to do so by a preponderance of the evidence. State v. Stubbs, 433 N.J. Super. 273, 285-86 (App. Div. 2013); State v. James, 346 N.J. Super. 441, 457 (App. Div. 2002). In assessing whether the State has met its burden to admit a tender years statement under N.J.R.E. 803(c)(27), the trial court must consider the "totality of the circumstances." State v. P.S., 202 N.J. 232, 240 (2010).

Although the Confrontation Clause analysis prescribed in Idaho v. Wright, 497 U.S. 805 (1990), has largely been supplanted by Crawford v. Washington, 541 U.S. 36 (2004), New Jersey courts still determine "trustworthiness" under

---

[4] We need not address the "incompetency proviso" of the Rule, which states "that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of Rule 601." See State ex rel. A.R., 234 N.J. 82, 98-102 (2018).

N.J.R.E. 803(c)(27) according to the non-exhaustive list of factors outlined in Wright. State v. Burr, 392 N.J. Super. 538, 569-70 (App. Div. 2007) aff'd as modified, 195 N.J. 119 (2008). The non-exhaustive list includes: "whether the statement was made spontaneously, whether the account is repeated with consistency, the mental state of the declarant, the use of terminology unexpected of a child of similar age, lack of a motive to fabricate, use of interrogation, and manipulation by adults." Id. at 570; see also P.S., 202 N.J. at 249 (identifying "a non-exclusive list of factors relevant to evaluating the reliability of out-of-court statements made by child victims of sexual abuse, including spontaneity, consistent repetition, mental state of the declarant, use of terminology unexpected of a child of similar age, and lack of motive to fabricate" (citing Wright, 497 U.S. at 821-22)).

Thus, courts will admit a child's pre-trial statement, pursuant to N.J.R.E. 803(c)(27), when the answers are spontaneous, the language used is appropriate for that of a similarly-aged child, "there [is] no motive to fabricate and there [are] no inconsistencies." State v. T.E., 342 N.J. Super. 14, 35 (App. Div. 2001). If those factors are satisfied, the statement will be deemed "probably trustworthy." Id. at 36.

"[I]n reviewing a trial judge's finding that a child's statement meets the trustworthiness requirement of N.J.R.E. 803(c)(27), appellate courts affirm unless the judge's determination amounted to an abuse of discretion." P.S., 202 N.J. at 250. We also uphold "a factual finding 'supported by sufficient credible evidence in the record.'" State ex rel. A.R., 234 N.J. 82, 104 (2018) (quoting P.S., 202 N.J. at 250). "Only if that finding is clearly mistaken should an appellate court intervene, in the interest of justice, to correct the error." Ibid.

Applying that standard, we discern no basis to disturb the trial court's finding of trustworthiness. Although the trial court's decision was conclusory, and did not expressly consider all the applicable factors, we find sufficient support in the record for the court's conclusion. The essence of Ashley's statement was unchanged, although there were certainly some inconsistencies between what Ashley told her mother, according to her mother; what she told the detective in her recorded statement; and what she testified at trial. Someone she knew then only as "Aaron's brother" touched her over her clothes on her buttocks and vagina, and displayed his penis. Although she incorporated details that she must have heard from others, the core element of her story showed no obvious sign of manipulation by others.

Ashley appeared attentive during the videotaped interview and responded to all of the detective's questions. When asked if Ashley understood all of the questions asked, O'Malley testified, "I think so for the most part. I mean…she's six so there were some things that, you know, I don't know if she knew the answers to but she did the best she could, I think." He also asked follow-up questions to clarify if she understood, and if more details were needed. O'Malley conducted the interview with Ashley without her mother alongside her, which would also decrease the likelihood of influence or coercion. See Burr, 392 N.J. Super. at 571 (admitting child's statement at pre-trial interview, and noting that investigator "questioned [victim] without anyone else in the room, minimizing the possibility that [victim]'s answers were manipulated or coerced in any way").

Additionally, the narrative Ashley provided was not one a child would normally be able to describe, unless she had been subjected to it. See State v. Nyhammer, 197 N.J. 383, 411 (2009) (child victim's statements trustworthy where "[the victim] exhibited sexual knowledge beyond the experience of a typical child of similar age"). Ashley recounted Frank asking if she wanted a boyfriend, to which she responded, "no," and then Frank told her to touch his genitals, which she also refused. Ashley also used words like "thing," when referring to Frank's private parts, that were appropriate for a child of her age.

13

The record does not reflect that Ashley had any motive to fabricate the story against Frank, as both of them testified that they had never met, or spoken, before she identified him as the assailant when speaking with her mother.

Frank contends that, numerous times in the interview, Ashley used language that indicated other adults had influenced her. For example, Ashley stated, "After my cousin [Steven] caught . . . him that day, he took his ball and ran and – and run to home to change his clothes cause he was musty [sic]." Ashley would not have known these details from the assault itself. Rather, she must have learned them from others. However, Ashley's insertion of these details does not taint the core allegation that she had maintained throughout.

Frank also contends that Ashley's recounting of the assault was not spontaneous, since Ashley's mother repeatedly asked her what happened, without an answer, and also struck her to prompt Ashley to answer her mother's questions. A child's reticence to speak should not necessarily detract from a statement's reliability. See T.E., 342 N.J. Super. at 35 (admitting child's pre-trial statement to social worker and finding it "probably trustworthy," notwithstanding victim was "initially reluctant to talk"). Additionally, Ashley's reluctance to confront her accuser, in person, should not undermine the reliability of her initial statement to her mother, after the assault, that she had

been outside with "Aaron's brother." Furthermore, by striking Ashley, her mother may have prompted Ashley to respond verbally, but did not suggest Ashley's answer. See Burr, 392 N.J. Super. at 571 (rejecting claim by defendant that mother coerced victim into asserting assault allegation, as "there was no evidence [mother] suggested to [victim] that defendant sexually assaulted her").

In sum, the trial court did not abuse its discretion in admitting Ashley's statements.

III.

Frank contends that the prosecutor committed reversible error by asking him if Thomas had any reason to lie about Frank's whereabouts on the day in question. Frank highlights the error was compounded when the prosecutor noted the answer in his closing statement, and by the judge in his oral decision.

During cross-examination, the assistant prosecutor asked Frank if Thomas "would . . . have any reason to lie about seeing you running?" Frank responded, "No." The State emphasized this point in its summation, stating that, "[Frank] testified that he never ran anywhere that day but [Thomas] had no reason to lie. Your Honor, I submit it's not the State that's telling you that [Thomas] had no reason to lie, the defendant told you that [Thomas] had no reason to lie."

The judge also noted this testimony in his oral decision, stating that, "[w]hen the juvenile testified and [was] asked, does [Thomas] have any reason to lie, no, [Thomas] ha[d] no reason to lie.  [Frank] didn't want to explain what [Thomas] said but he said [Thomas] had no reason to lie."

As defendant failed to object to the question or the comment in summation, we review the point on appeal under the plain error standard.  State v. Santamaria, 236 N.J. 390, 404 (2019).  We will disregard an error "'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Bueso, 225 N.J. 193, 202 (2016) (quoting R. 2:10-2).

To support his argument, Frank relies on three cases that addressed a similar claim: State v. Bunch, 180 N.J. 534 (2004); State v. T.C., 347 N.J. Super. 219 (App. Div. 2002); and State v. Green, 318 N.J. Super. 361 (App. Div. 1999) aff'd, 163 N.J. 140 (2000).  Frank correctly observes all three cases unequivocally state that asking one witness if another is lying is inappropriate and impermissible; however, critically, it was held in all three cases this type of questioning alone did not support reversal.

In Bunch, the Supreme Court

> agree[d] with defendant that the assistant prosecutor should not have asked [the] defendant to assess the credibility of another witness . . . .  Nevertheless, in view of the substantial amount of evidence of

16

defendant's guilt and the trial court's instruction to the jury that it must determine the witnesses' credibility . . . conclude[d] that the improper statement was not so egregious that it deprived defendant of a fair trial.

[180 N.J. at 549 (internal quotation marks and citations omitted).]

Similarly, T.C. found "that such questioning is inappropriate and should not be countenanced."  347 N.J. Super. at 238.  Moreover, while reviewing the claim under the plain error standard, the court "agree[d] that the prosecutor should have refrained from such questioning, [but did] not find that the conduct constitutes a basis for reversing defendant's conviction."  Ibid.

Lastly, in Green, during cross-examination of the defendant, the prosecutor asked defendant four separate times whether the police officers who had testified were truthful.  318 N.J. Super. at 377.  We reversed on alternative grounds, but recognized that asking a witness to "characterize the testimony of another witness" was both "argumentative and highly improper."  Id. at 378. However, that conduct did not independently support reversal, as "the evidence of guilt was overwhelming."  Ibid.  We also "direct[ed] that this method of cross-examination not be repeated" on re-trial.  Ibid.

By contrast, the Court in State v. R.K., 220 N.J. 444, 460 (2015) noted that as a general rule, "other witnesses are prohibited from giving their opinions

about [another witness's] credibility."  The Court found reversible error, under the plain error standard, where a step-sister bolstered the victim's credibility in a case that "presented a 'pitched credibility battle.'"  Id.  at 461 (quoting State v. Frisby, 174 N.J. 583, 596 (2002)).

In Frisby, a child died of child abuse.  The defendant-mother and the father each claimed the other was responsible for the boy when he suffered fatal injuries.  The Court reversed a jury conviction because police officers, using inadmissible hearsay, testified that "out-of-court statements of non-testifying witnesses," "substantiated" the father's testimony in a case, and the father was "more credible" than the mother.  As the Court recently explained its reasoning in Frisby:

> We found the admission of that testimony constituted plain error beyond the simple fact that it offered inadmissible hearsay.  As the "case was a pitched credibility battle" between the mother and father, we explained that, "by 'necessary inference,'" the police testimony regarding the father's credibility unfairly and "'irresistibly' implicated [the mother]." We observed that juries "may be inclined to accord special respect to" police testimony, and accordingly held that "[a]ny improper influence on the jury that could have tipped the credibility scale was necessarily harmful and warrants reversal" . . . .
>
> [State v. Trinidad, ___N.J. ___, ___ (2020) (slip op. at 22-23) (quoting Frisby, 174 N.J. at 593-96, 595, 596).]

Notably, in Trinidad, the Court held that a witness's opinion about the defendant's credibility did not constitute plain error largely because of the strength of the evidence, in particular, evidence challenging the defendant's credibility. Id. at ___ (slip op. at 23-24).

We discern from these cases the principle that one witness's improper bolstering of another will survive plain error review when there is overwhelming evidence to support the trial court decision. At the other end of the spectrum, when the case boils down to a "pitched credibility battle," Frisby, 174 N.J. at 596, or there is "scant evidence," Trinidad, ___ N.J. at ___ (slip op. at 24), reversal may be warranted if the credibility opinion may have tipped the scales.

This case falls somewhere between those two extremes. The State presented overwhelming evidence that Ashley was assaulted. Her testimony was corroborated by Steven, an eyewitness. The key question at trial was whether the assailant was Frank, or someone else. Although the evidence supporting Ashley's identification was not overwhelming, it was not scant, either. Ashley did not know Frank's name, but she told her mother she recognized her assailant as "Aaron's brother" – someone she had seen before. Furthermore, although there were obvious credibility questions at trial, they principally related to differences in the testimony of Ashley and Frank, and

between Helen and Frank's mother and aunt. Thomas was a secondary witness, who provided circumstantial evidence of Frank's guilt, by testifying that he saw Frank run shortly after the assault took place.

We also may infer that defense counsel did not perceive as prejudicial Frank's testimony about Thomas's motive to lie, because she did not object to it at trial. See State v. Nelson, 173 N.J. 417, 471 (2002) (holding that a failure to object to testimony permits an inference that any error in admitting the testimony was not prejudicial); State v. Frost, 158 N.J. 76, 84 (1999) (stating "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made"). We note that during the State's case, in order to discredit Steven's testimony on a point of disagreement with Thomas's testimony, defense counsel herself repeatedly asked Steven whether Thomas had lied. In summation, defense counsel's apparent strategy was to highlight inconsistencies of the State's witnesses, including Thomas; in doing so, she both questioned and relied on statements Thomas made.[5]

---

[5] For example, defense counsel relied on Thomas's statement that he did not notice that the boy he saw running through the yard had a basketball, although Steven insisted that Ashley's attacker had one, and fled with one. On the other hand, defense counsel suggested that Thomas had the facts wrong about what Frank was wearing at various points in the day.

We conclude that Frank's opinion about Thomas's motive to lie was not "clearly capable of producing an unjust result," R. 2:10-2, nor did it deprive Frank of a fair trial. While we echo this court's, and the Supreme Court's, previous admonitions that it is inappropriate to elicit one witness's opinion about the credibility or motive to lie of another witness, the questioning and prosecutor's comment do not warrant reversal under plain error review.

IV.

Defendant's remaining arguments lack sufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(2).

In particular, there was sufficient credible evidence to support the trial court's decision, to which we defer. The "findings of the trial judge . . . are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964).

We also discern no abuse of discretion in the court's disposition, involving non-custodial probation and treatment; it was neither manifestly excessive nor unduly punitive, nor does it shock the conscience. State v. O'Donnell, 117 N.J. 210, 215-16 (1989). The court found aggravating factors (b) ("grave and serious harm inflicted on the victim and that based upon the juvenile's age or mental

21

capacity the juvenile knew or reasonably should have known that the victim was particularly vulnerable or incapable of resistance due to advanced age, disability, ill-health, or extreme youth, or was for any other reason substantially incapable"); (g) (need to deter the juvenile and others); (j) ("impact of the offense on the victim"); and (l) (juvenile's "threat to the safety of the public or any individual"). The court also found mitigating factors (a) (juvenile under fourteen); (c) ("[t]he juvenile did not contemplate that the juvenile's conduct would cause or threaten serious harm"); (h) (lack of prior history of delinquency); (j) (juvenile's "character and attitude . . . indicate that the juvenile is unlikely to commit another delinquent or criminal act"); and (k) (likelihood of responding "affirmatively to noncustodial treatment"). There was sufficient competent evidence in the record to support those findings. Id. at 215.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION