**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5252-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CONRAD R. SIPA,

    Defendant-Appellant.

_____

Argued April 26, 2021 – Decided August 6, 2021

Before Judges Fasciale and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 17-02-0211.

John Vincent Saykanic argued the cause for appellant.

William Kyle Meighan, Senior Assistant Prosecutor, argued the cause for respondent (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel Marzarella, Chief Appellate Attorney, of counsel; William Kyle Meighan, on the brief).

PER CURIAM

Defendant appeals from his jury trial convictions for first-degree murder and related weapons offenses, and for hindering prosecution and tampering with evidence at the crime scene. Defendant does not dispute that he killed the victim, Richard Doody, but claims he was acting in self-defense. Defendant raises numerous issues on appeal. He contends the trial court committed plain error on several occasions in providing instructions to the jury, abused its discretion by excluding testimony from defense expert witnesses and by admitting autopsy photos of the victim, and erred in denying defendant's pretrial motion to suppress evidence police seized from his home and vehicle pursuant to search warrants. Defendant also contends the prosecutor repeatedly committed misconduct during her summation. He argues that the cumulative effect of these alleged trial errors warrants reversal. After carefully reviewing the record in light of the applicable legal principles, we reject these contentions and affirm.

## I.

In February 2017, an Ocean County grand jury charged defendant with first-degree murder, N.J.S.A. 2C:11-3(a); three counts of third-degree possession of a weapon (a knife, a golf club, and a lamp) for an unlawful purpose, 2C:39-4(d); fourth-degree unlawful possession of a weapon, the knife, N.J.S.A. 2C:39-5(d); third-degree hindering apprehension or prosecution,

N.J.S.A. 2C:29-3(b)(1); and fourth-degree tampering with evidence, N.J.S.A. 2C:28-6(1).

Prior to trial, defendant moved to suppress evidence seized from his home and vehicle alleging deficiencies in the search warrants. On February 6, 2018, the motion court rendered a sixteen-page written opinion denying defendant's suppression motion.

Defendant was tried over the course of five days in March and April 2019. The jury found defendant guilty on all counts except the count charging possession of the golf club for an unlawful purpose.

On June 14, 2019, the trial court heard and denied defendant's motion for a new trial. That same day, the court sentenced defendant to an aggregate term of forty-five years in prison subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Because defendant contends the verdict was against the weight of the evidence, and because the strength of the State's case is a relevant consideration in applying the plain error rule, we recount the proofs elicited at trial in detail. In January 2015, Staten Island residents Richard Doody, a retired New York City fireman, and his wife of thirty years Virginia Murray, purchased a second home in Barnegat Light, the northernmost town on Long Beach Island. In May 2015, Doody, an avid fisherman and golfer, moved into the second home full-

time for the summer and fall while Murray continued to live in Staten Island but visited on weekends.

At 1:30 p.m. on Saturday, November 21, 2015, Doody texted Murray, who was at their primary residence on Staten Island, advising her that defendant, a long-time friend, had "invited himself over." Doody and Murray met defendant through a scuba club in 2001. By 2004, Doody and defendant had become friends, and in 2008 Doody served as best man at defendant's wedding.

Murray received a final message from Doody at 5:15 p.m. He did not return her texts on Sunday. Murray found this unusual but assumed he was fishing with defendant. When she still had not heard from Doody by noontime on Monday, November 23, 2015, Murray grew worried and texted defendant. After receiving no response, she texted defendant's wife, Theresa Masone. Masone called back but was unable to assuage Murray's concern. Hours later Murray again texted Masone but received no response. Murray then called the Long Beach Township police department to request a wellness check at the Barnegat Light home.

Police arrived at the home just before 5:00 p.m. They found no sign of a forced entry. Upon entering the house, they discovered Doody's body wrapped in a green blanket on the floor in the living room near an armchair in front of a window covered with vertical blinds. Doody had severe trauma to his head,

4

which was covered with blood, and a gaping hole in the front of his neck. There were broken ceramic pieces on the victim's blood-stained shirt and on the chair. There were bloodstains on the back, seat, and arms of the chair, and blood splatter on the wall and the vertical blinds behind the chair.

Police investigators determined that Doody's phone and iPad were missing from the home. Police also discovered: (1) a broken, right-handed golf club; (2) pieces from the broken ceramic lamp base, some of which were bloody including one with a bloody light bulb and cord still attached; (3) a Blue Moon beer bottle; (4) a thirteen-inch bloodstained serrated knife with meat prongs on the end in the sink; (5) a green and black backpack on the seat of the chair; (6) blood-stained paper towels; and (7) other beer bottles and the top to a bottle of Patron tequila. The investigators also noted that one of the house's front door light fixtures was missing the round glass portion of its lightbulb, although the base was still attached to the socket.

Subsequent testing confirmed that Doody's blood was on the blade of the knife found in the sink. Two sources of DNA were recovered from the blood on the knife handle: the major source was Doody, but the minor source was inconclusive. The blood on the light bulb and lamp cord came from two sources: defendant was the major source, while Doody was the minor source. Bloody finger- and palm-prints found on the indoor lamp light bulb were traced to

5

defendant. No fingerprints were lifted from the broken golf club nor was blood testing performed on it, although the other golf clubs in the house were swabbed for blood.

Dr. Ian Hood performed an autopsy on November 24, 2015. He noted that Doody had a gaping five-inch slash wound across the anterior neck, with a deep stab wound on each side, one of which passed through the larynx and across the epiglottis. Dr. Hood determined that the sharp object used to cut Doody's neck had been sawn back and forth, and that Doody drowned in his own blood. There also were several small punctate stab wounds on Doody's chin and neck.

Hood determined Doody also suffered a series of ten lacerations to the skull, including two that pushed the bone into the brain. Hood opined that those lacerations appeared to be caused by blunt force trauma, and "fit perfectly well with the large heavy broken ceramic lamp base." There were no injuries to the right side of Doody's head. He did have minor bruising on the inside of his left arm, and a few scratches and abrasions on the backs of his hands and bruising on his left knuckles.

Hood concluded that Doody died as a result of blunt and sharp injuries to his head and neck, and that the neck wound "probably killed him more than any other" injury. He classified the death as a homicide. Hood noted that Doody's blood alcohol content (BAC) was .252%. He further opined that Doody was

6

upright when he was struck about the head because his blood flowed down his head and neck and onto his clothing. He also believed that Doody's body remained in an upright seated position for several hours after he died as the body developed lividity in the feet, and that the body was subsequently rolled into the blanket on the floor.

Detective John Murphy of the Ocean County Prosecutor's Office spoke with Murray after the body was discovered and identified defendant as a person of interest. During this conversation, Murray told the detective that Doody could be "belligerent" when drunk.

Police determined that defendant purchased Macallan scotch, a Rolling Rock twelve-pack, and a Blue Moon Belgium Ale twelve-pack at a liquor store in Manahawkin at 2:44 p.m. on Saturday, November 21, 2015. After confirming that defendant owned a red Jeep Grand Cherokee, officers reviewed video surveillance from traffic cameras on Long Beach Island, as well as EZ Pass records and data captured by a police license plate reader. Surveillance video showed defendant's Jeep traveling north on Long Beach Island towards Doody's residence at around 3:00 p.m. Defendant left Long Beach Island heading north on the Garden State Parkway at 12:35 a.m. on Sunday, November 22. He returned to Long Beach Island shortly before 8:00 a.m. the same day. Cameras captured him traveling north towards Doody's house at 8:34 a.m., then south at

7

10:29 a.m., north again at 11:28 a.m., and finally south at 11:57 a.m. Defendant departed Long Beach Island at 12:49 p.m. and did not return.

On November 25, 2015, officers arrested defendant at his home and brought him to the police station where he was photographed. Defendant, who was right-handed, had a small abrasion on knuckles of his left hand, a small laceration covered by a band aid on his left pinky, another laceration on his left palm near his thumb, and a healing bruise to his left inner bicep.

While searching defendant's home pursuant to a warrant, police found: (1) an open case of Blue Moon in the garage; (2) an empty Patron tequila bottle matching the cap found at the crime scene; (3) a watch stained with Doody's blood; (4) a photo of defendant's wedding party including Doody; (5) a red-stained shower drain strainer in the master bath; and (6) a light bulb that matched the broken outdoor fixture found at the crime scene. Police did not find Doody's phone or iPad at defendant's home. They found no records indicating that defendant and Doody had financial dealings that might have provided a motive for murder. A search of defendant's Jeep revealed a Blue Moon bottle cap and red stains on the back rear seat, later determined to be defendant's blood.

At trial, Murray testified that Doody was left-handed but a right-handed batter at softball. Doody kept golf clubs in the Barnegat Light home and would practice his swing in the house. She described Doody as "belligerent" when

8

drunk; she later explained she meant that if she asked him to do something, he would do the opposite.

Detective John Garkowski of the Burlington County Prosecutor's Office testified as an expert in crime scene reconstruction and bloodstain and blood spatter analysis. Garkowski explained that prior to preparing his report, he reviewed the police and autopsy reports, the crime scene and autopsy photos, and personally examined a portion of the ceramic lamp, the lamp shade, the serrated two-prong knife, the victim's shirt, and the broken golf club head. Garkowski opined that Doody was first beaten with a blunt force object numerous times and then slashed and stabbed while sitting upright in the living room chair. He further testified that Doody's body remained upright in the chair for a period of time before being moved to the floor where it was found.

In reaching these conclusions Garkowski relied upon: (1) the head-height blood spatter on the blinds behind the chair; (2) the transfer blood stains on the back of the chair; (3) the fact that blood from Doody's head injuries flowed straight down his face and head; (4) the fact that the blood flow from Doody's head had time to dry and fix in that pattern; and (5) the bit of ceramic found stuck to the back of the chair by blood. Garkowski further noted there was fixed purple lividity on Doody's right foot from blood settling at the lowest part of the body, as well as an area of white on the bottom of the foot. He explained it took

9

roughly eight hours for lividity to fix and that the area of white indicated that it was in contact with a hard surface—the floor—when lividity set in.

Based on the abrasions on Doody's head, Garkowski determined that the blunt force weapon measured four inches by two-and-one-half inches. He acknowledged that either the lamp or the broken golf club could have inflicted these injuries. However, the damage to the lamp and the blood droplets that remained led him to believe that the perpetrator used the lamp to strike Doody.

Garkowski further concluded that the serrated knife—which had a two-pronged meat fork at the tip—found in the sink was used to inflict the sharp force injuries to Doody. He explained that the puncture wounds and the abrasion pattern found in conjunction with the slashes to Doody's body matched the surface and end of the knife. Garkowski noted that after the slash to his neck, Doody's chin was in contact with his chest, as evidenced by the lack of blood under his chin.

Garkowski testified that the impact spatter on the sleeves of Doody's shirt indicated he was holding his hands up by his head. Garkowski also testified that the blood castoff pattern meant the weapon that caused Doody's head injuries was moving from left to right. He further opined that the orientation of bloody handprints on the arms of the chair indicated that they were likely made by

10

someone other than Doody, although Garkowski acknowledged that Doody could have twisted in the seat and placed each hand on the opposite chair arm.

Defendant elected not to take the stand but presented Janice Johnson, an expert in blood spatter and crime scene reconstruction. In preparation, Johnson reviewed photos of the crime scene and the autopsy report. She opined that: (1) the perpetrator used the lamp first and then the knife; (2) the round abrasions on Doody's head indicated the lamp rod was used as a weapon; (3) the punctate wounds were consistent with use of a knife; and (4) there was "pretty obvious" evidence of cleanup, such as the wrapping and moving of the body, and that the scene appeared "staged" or "altered." Johnson agreed that "[e]verything is consistent with the victim being [seated] in the chair during bloodletting."

Johnson stated that she would have liked for the broken golf club and Doody's clothes to have been tested for DNA. She believed that the piece of ceramic found on the back of the chair was resting on a fold in the fabric, not affixed by blood. She opined that the abrasions and contusions on both Doody and defendant indicated a bloodless physical altercation occurred prior to bloodletting, and that as a result of this altercation, Doody could have been thrown into the chair. Johnson agreed with Hood that: (1) Doody swallowed blood; (2) there was lividity on the bottom of Doody's right foot and underneath his right thigh; (3) defendant's hands could have been cut by shards from the

11

lamp; (4) Doody could have been sitting the entire time of the attack; and (5)

Doody was sitting when he was hit in the head with a blunt instrument.

Defendant raises the following contentions for our consideration:

POINT I

THE TRIAL COURT'S ERRONEOUS INSTRUCTION AS TO WHAT THE JURY WAS REQUIRED TO FIND IN ORDER TO DISALLOW SELF-DEFENSE UNDER N.J.S.A. 2C:3-[4](b)(2) (THE COURT'S INCORRECTLY INSTRUCTING THAT: "THE DEFENDANT, WITH THE PURPOSE OF CAUSING DEATH OR SERIOUS BODILY HARM TO ANOTHER PERSON, OR PROVOKED OR INCITED THE USE OF FORCE AGAINST HIMSELF IN THE SAME ENCOUNTER, THEN THE DEFENSE IS NOT AVAILABLE TO HIM") CONSTITUTES PLAIN ERROR AND DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL AND IMPROPERLY SHIFTED THE BURDEN OF PROOF (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10) (not raised below)

POINT II

THE TRIAL COURT COMMITTED PLAIN ERROR IN ITS INSTRUCTIONS BY NOT INSTRUCTING THE JURY THAT IT NEEDED TO UNANIMOUSLY AGREE ON THE FACTORS DISPROVED BY THE STATE BEYOND A REASONABLE DOUBT AND FAILED TO PROVIDE THE JURY WITH A SPECIAL INTERROGATORY REGARDING THE THEORY FORMING THE BASIS FOR ITS CONVICTION RESULTING IN AN UNCONSTITUTIONAL "PATCHWORK/FRAGMENTED" OR LESS THAN

UNANIMOUS VERDICT IN VIOLATION OF DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL CONTRARY TO U.S. CONST. [AMENDS.] V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10; AND RULE 1:8-9 (not raised below)

POINT III

THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THAT SELF-DEFENSE APPLIES NOT ONLY TO MURDER BUT TO THE MANSLAUGHTER OFFENSES CONSTITUTES PLAIN ERROR AND DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10; AND R[ULE] 1:8-9 (not raised below)

POINT IV

THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND VIOLATED DEFENDANT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS BY PRECLUDING DEFENDANT'S SELF-DEFENSE DEFENSE BY PRECLUDING DR. BRICK'S EXPERT TESTIMONY AS TO: I) THE PROPER CONTEXT AS TO WHAT A .252% BAC MEANS (I.E., HOW MUCH ALCOHOL DID DOODY CONSUME); AND II) WHAT DOES THE HEAVY INTOXICATION OF DOODY MEAN IN TERMS OF HIS INCREASED AGGRESSION; DR. BRICK'S EXPERT TESTIMONY WAS BEYOND THE KEN OF THE AVERAGE JUROR AND WAS NOT A "NET OPINION" (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10)

POINT V

THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A NEW TRIAL UNDER R[ULE] 3:20-1 AS JUDGE CUNNINGHAM ERRED IN PRECLUDING THE EXPERT TESTIMONY OF DR. BRICK IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS AND RIGHT TO HAVE COMPULSORY PROCESS FOR OBTAINING WITNESSES IN HIS FAVOR IN VIOLATION OF THE SIXTH AMENDMENT AND ARTICLES 1, 9[,] AND 10 OF THE NEW JERSEY CONSTITUTION (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10)

POINT VI

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY PRECLUDING DEFENDANT'S SELF-DEFENSE DEFENSE BY BARRING DETECTIVE EELMAN'S EXPERT TESTIMONY AS DETAILED IN HIS SEPTEMBER 13, 2018 REPORT IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS AND SIXTH AMENDMENT RIGHT TO [PRESENT] A DEFENSE AND RIGHT UNDER THE NEW JERSEY STATE CONSTITUTION TO OBTAIN WITNESSES IN HIS FAVOR (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10)

POINT VII

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY PERMITTING THE EXPERT OPINION OF THE STATE'S EXPERT JOHN GARKOWSKI IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS AND STATE CONSTITUTIONAL RIGHT TO A FAIR

14

TRIAL (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10)

POINT VIII

THE IMPROPER STATE'S CLOSING STATEMENT AND TRIAL COURT'S DENIAL OF THE MISTRIAL MOTION DEPRIVED DEFENDANT OF HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10)

POINT IX

THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A NEW TRIAL UNDER R[ULE] 3:20-1 DUE TO PROSECUTORIAL MISCONDUCT BASED UPON THE STATE'S IMPROPER SUMMATION IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10)

POINT X

THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS BY: I) IMPROPERLY DELEGATING TO LAW ENFORCEMENT OFFICERS ESSENTIAL DECISIONS ABOUT WHEN AND HOW TO EXECUTE THE SEARCH WARRANT WITHOUT PROVIDING THE JUDICIAL OVERSIGHT REQUIRED BY THE UNITED STATES CONSTITUTION AMENDMENTS IV AND XIV; THE NEW JERSEY CONSTITUTION ARTICLE I, PARAGRAPH 7, R[ULE] 3:5-5[,] AND THE PLAIN LANGUAGE OF THE WARRANT

15

FORM AS THE SEARCH WARRANT OF DEFENDANT'S HOME AUTHORIZED EXECUTION AT "ANYTIME"; II) DETECTIVE GARDNER'S AFFIDAVIT FAILED TO ESTABLISH PROBABLE CAUSE TO BELIEVE THAT PARTICULAR ITEMS SOUGHT AS RECITED ON THE FACE OF THE WARRANT WERE CONNECTED TO THE CRIMINAL ACTIVITY BEING INVESTIGATED; III) THE SEARCH WARRANT OF DEFENDANT'S HOME FAILED TO ESTABLISH PROBABLE CAUSE TO FACTUALLY ESTABLISH THAT THE MATERIALS DESCRIBED IN THE WARRANT WERE TO BE FOUND AT THE PREMISE TO BE SEARCHED; AND IV) THE SEARCH OF THE HOME WAS STALE.

POINT XI

THE TRIAL COURT ERRED IN ADMITTING OBJECTIONABLE PHOTOGRAPHS IN VIOLATION OF THE DEFENDANT SIPA'S SIXTH AMENDMENT AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT[S] AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10)

POINT XII

THE TRIAL COURT ERRED IN DENYING THE MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT ONE AS THE STATE DID NOT PROVE DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT; THE CONVICTION IS CONTRARY TO THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND NEW JERSEY STATE CONSTITUTION (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10)

POINT XIII

THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A NEW TRIAL UNDER R[ULE] 3:20-1 AS THE VERDICTS ARE AGAINST THE WEIGHT OF THE EVIDENCE (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10)

POINT XIV

THE NUMEROUS LEGAL ERRORS COMMITTED BY THE TRIAL COURT DEPRIVED DEFENDANT OF HIS FIFTH, SIXTH[,] AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT[S] TO A FAIR TRIAL AND NEW JERSEY CONSTITUTIONAL RIGHT TO A FAIR TRIAL (U.S. CONST. AMEND[S]. V, VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 9, 10) (partially raised below)

II.

Defendant contends for the first time on appeal that the trial court committed plain error while instructing the jury on three distinct occasions. We begin our analysis by reaffirming certain bedrock principles of our criminal justice system. It is axiomatic that "'[a]ppropriate and proper charges to a jury are essential for a fair trial.'" State v. Maloney, 216 N.J. 91, 104–05 (2013) (alteration in original) (quoting State v. Green, 86 N.J. 281, 287 (1981)). As our Supreme Court stressed in Green, proper jury charges are critical in a criminal case when a person's liberty is at stake. 86 N.J. at 289. Accordingly, "[e]rroneous instructions on matters or issues that are material to the jury's

deliberation are presumed to be reversible error in criminal prosecutions." State v. Jordan, 147 N.J. 409, 422 (1997) (citing State v. Warren, 104 N.J. 571, 579 (1986)). Thus, for example, "the failure to charge the jury on an element of an offense is presumed to be prejudicial error, even in the absence of a request by defense counsel." State v. Federico, 103 N.J. 169, 176 (1986) (citing State v. Grunow, 102 N.J. 133, 148 (1986); State v. Collier, 90 N.J. 117, 122–23 (1982); and State v. Green, 86 N.J. 281, 288 (1981)).

However, if defense counsel fails to challenge the instructions that are given, reversal will only be warranted where the alleged error was "clearly capable of producing an unjust result." R. 2:10-2; State v. Torres, 183 N.J. 554, 564 (2005); Jordan, 147 N.J. at 421–22. Plain error in the context of a jury charge requires demonstration of "'[l]egal impropriety of the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Burns, 192 N.J. 312, 341 (2007) (quoting Jordan, 147 N.J. at 422).

In determining whether a charge was erroneous, the charge must be read as a whole. Jordan, 147 N.J. at 422 (citing State v. Wilbely, 63 N.J. 420, 422 (1973)). "Portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall

18

effect." Ibid. The effect of any error, moreover, must be considered "'in light of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

A.

With these general principles in mind, we first address defendant's contention the trial court committed plain error by misreading the jury instruction on self-defense. The trial court read the self-defense model jury charge verbatim until it began describing the limitations on the use of deadly force. The transcript shows the court mistakenly inserted the word "or" at one point during its oral recitation.[1] The relevant portion of the transcript reads:

---

[1] In relevant part, the self-defense model jury criminal charge reads as follows: "If you find that the defendant, with the purpose of causing death or serious bodily harm to another person, provoked or incited the use of force against him in the same encounter, then the defense is not available to him." Model Jury Charges (Criminal), "Justification – Self Defense in Self Protection (N.J.S.A. 2C:3-4)" (rev. June 13, 2011).

We note that a copy of the written jury instructions was provided to the jury. The State argues that the trial court's error in its oral recitation was remedied by the fact the jury had the correctly-worded written instructions in the jury room when deliberating, but cites no authority for the proposition that the written charge given to the jury takes precedence over the instructions given orally in open court. We choose not to speculate on whether the jury consulted the written charge and relied on it to correct the misstatement. We note also that while the State suggests the inclusion of the word "or" may be a transcription error, it made no motion to correct the record. We therefore assume for purposes of this appeal the trial transcript is accurate and that the oral recitation error occurred.

If you find that the defendant, with the purpose of causing death or serious bodily harm to another person, <u>or</u> provoked or incited the use of force against himself in the same encounter, then the defense is not available to him. If you find the defendant knew that he could avoid the necessity of using deadly force by retreating, provided that the defendant knew he could do so with complete safety, then the defense is not available to him.

[(emphasis added).]

Defendant argues that by mistakenly inserting the word "or," the trial court "fatally lessened the [State's] burden of proof." Defendant contends the court's misreading of the model jury charge eliminated the availability of this defense by instructing the jury, in essence, that "[i]f you find that the defendant [acted], with the purpose of causing death or serious bodily harm to another, . . . then the defense is not available to him." Defendant argues, in other words, that the jurors were instructed that should they find defendant acted with the intent to cause death or serious bodily harm, he could not use self-protection as a defense, regardless of provocation.

We disagree. Viewed in the context of the entire instruction, we are satisfied the court's one-word recitation error did not render the self-defense doctrine unavailable to defendant. Nor did it have the capacity to produce an unjust result. In reaching this conclusion, we acknowledge the critical importance of the self-defense jury instruction in this case as defendant did not

20

dispute that his actions resulted in the victim's death. We nonetheless believe that defendant reads too much into the mistaken insertion of the word "or." The gravamen of the defense strategy was that Doody was the aggressor and provoked a responsive use of deadly force. Viewed in its entirety and in the context of the evidence and arguments of counsel, we do not believe the jury would have interpreted the judge's instruction on self-defense to mean the defense fails if defendant used any of the weapons with the purpose to cause death or serious bodily injury. We stress the recitation error related to the portion of the self-defense instruction regarding whether defendant provoked or incited the use of force against himself, not whether Doody was the aggressor and provoked defendant to use deadly force in self-defense.

Notwithstanding the presumption of reversible error recognized in Jordan, 147 N.J. at 422, the fact that trial counsel failed to object suggests the court's fleeting misstatement did not eviscerate the crucial defense theory as defendant now posits. Cf. State v. Montalvo, 229 N.J. 300, 320 (2017) (noting that when defendant does not object to the jury charge, "there is a presumption the charge was not error and was unlikely to prejudice the defendant's case") (citing State v. Singleton, 211 N.J. 157, 182 (2012)). If the judge's misstatement had the impact defendant now contends, we would expect counsel to have recognized the error and sought remediation at that time. Cf. State v. Bueso, 225 N.J. 193,

203 (2016) (the plain error standard "provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error").

In applying the plain error rule to the facts of this case, we also take note of the overwhelming trial evidence disproving defendant's claim of self-defense beyond a reasonable doubt.  See Walker, 203 N.J. at 90.  All of the expert witnesses, including defendant's expert, Janice Johnson, opined that defendant was seated in the chair when he was hit in the head repeatedly with a blunt instrument and during the bloodletting.  Johnson agreed that the perpetrator used the lamp first and then the knife, suggesting Doody suffered serious blunt force wounds to his skull and brain before his neck was slashed.  Dr. Hood also testified that a "sawing" motion was used to cut the victim's neck with the serrated knife.  These circumstances strongly suggest that such deadly force was not "immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion."  N.J.S.A. 2C:3-4(a).  Considering all relevant circumstances, we conclude the trial court's misstatement was not capable of producing an unjust result.

B.

We turn next to defendant's contention the trial court committed plain error by failing to administer a specific unanimity charge with respect to the

22

three weapons the State alleged were used to kill the victim. We conclude the judge did not err in reading the jury instruction that was approved at the charge conference. Further, the record clearly shows the jurors were unanimous in finding that defendant used the knife and lamp but not the golf club.

Both the New Jersey Constitution and Court Rules require a unanimous jury verdict in criminal cases. N.J. Const. art. I, para. 9; R. 1:8-9. Defendant does not dispute that the jury was given the general instruction that their verdict had to be unanimous. Defendant argues for the first time on appeal that the general unanimity instruction was inadequate and that the trial court was required to instruct the jury they must unanimously agree as to which weapon(s) were used to cause Doody's death.

Specifically, defendant contends the trial court committed plain error by providing the following instruction:

> The use of a deadly weapon such as the knife, lamp, and/or golf club in itself would permit you to draw an inference that the defendant's purpose was to take life or cause serious bodily injury resulting in death. A deadly weapon is any firearm or other weapon, device, instrument, material or substance which, in the manner it is used or is intended to be used, is known to be capable of producing death or serious bodily injury. In your deliberations, you may consider the weapon used and the manner and circumstances of the killing, and if you are satisfied beyond a reasonable doubt that defendant inflicted blunt or sharp force trauma and killed Richard Doody with a knife, lamp, and/or golf

23

club[,] [y]ou may draw an inference from the weapon used, that is . . . a knife, lamp and/or golf club, and from the manner and circumstances of the killing, as to defendant's purpose or knowledge.

We acknowledge that in certain circumstances a general charge on jury unanimity will not suffice.  In State v. Parker, our Supreme Court explained that a more specific unanimity instruction may be needed "where the facts are exceptionally complex, or where the allegations in a single count are either contradictory or only marginally related to another, or where there is a variance between the indictment and the proof at trial, or where there is a tangible indication of jury confusion."  124 N.J. 628, 636 (1991) (citations omitted). None of those circumstances apply in this case.

In State v. Scherzer, we applied the Parker factors and held that a general unanimity instruction was sufficient where the offenses charged required only one type of criminal act—sexual penetration.  301 N.J. Super. 363, 479 (App. Div. 1997).  The indictment in that case alleged four separate acts of sexual penetration involving the use of a bat, a broom, a stick, and fingers.  We concluded that the alleged acts of penetration were conceptually similar enough not to have required a specific unanimity charge.  Id. at 479–80.  In other words, it was not necessary to instruct the jurors they had to unanimously agree as to the object(s) used to commit sexual penetration.

The rationale undergirding our conclusion in Scherzer applies as well in the case before us. Here, the criminal act was the use of deadly force as part of a single violent episode. The three instrumentalities allegedly used to kill Doody—the lamp, the knife, and the golf club—were conceptually similar in that they all could be used as weapons to inflict fatal injury.

Also as in Scherzer, the facts concerning the use of force in this case are not exceptionally complex, the allegations in the indictment are neither contradictory nor only marginally related to another, there is no variance between the indictment and the proof at trial, and there is no tangible indication of jury confusion, as might be shown if the jurors had requested a supplemental instruction.

Defendant's reliance on State v. Frisby, 174 N.J. 583, 599–600 (2002), is misplaced, as the circumstances of that case are readily distinguishable. In Frisby, the State proffered two distinct factual scenarios to prove a single count of endangering the welfare of a child: either the defendant injured the minor victim, or the defendant abandoned the child in a motel room. Id. at 599. Frisby argued that the unanimity aspects of the jury instruction were presented in such a way as to "allow a non-unanimous patchwork verdict against her." Ibid. Specifically, she asserted that her conviction could have been the result of some jurors believing she was at the motel when the minor's injuries were sustained

while others believed she abandoned the minor for a night on the town. Ibid. The Supreme Court agreed, concluding the State's theories were advanced based on entirely different acts and evidence. Ibid.

Causing physical injuries to a child is very different from abandoning a child, reflecting distinct theories of criminal liability under the endangering statute, N.J.S.A. 2C:24-4, which encompasses the wide range of conduct that could make a child an abused or neglected child as defined in N.J.S.A. 9:6-3 and 9:6-8.21. Abuse/neglect by physically injuring a child therefore is conceptually distinct from abuse/neglect by abandoning a child.

Here, in contrast, fatally injuring a victim with a knife is not conceptually distinct from fatally injuring the victim with a blunt object. In either circumstance, physical objects are used as a weapon during an altercation to inflict serious injury resulting in death. We believe this situation is closely analogous to the circumstances in Scherzer, where multiple objects were alleged to have been used to commit sexual penetration. Accordingly, it makes no difference for purposes of Parker analysis which combination of the three alleged weapons were used to inflict the wounds that resulted in Doody's death.

Defendant nonetheless argues that his claim of self-defense would have been substantially stronger if the jury believed he used the lamp to kill Doody, rather than the golf club or knife. That argument ignores the fact that none of

the experts concluded that the lamp was the only weapon used. Indeed, defendant's own expert opined the perpetrator used the lamp first and then the knife, which had the victim's blood on the blade.

The gravamen of defendant's plain error argument is that it was incumbent on the jury to unanimously agree on which weapon(s) were used. We do not agree with that proposition, but in any event the verdict shows that the jury <u>was</u> unanimous with respect to the weapons that defendant employed during the fatal altercation. Defendant was convicted on the two separate counts charging unlawful possession of the lamp and the knife for an unlawful purpose. He was acquitted on the count charging possession of the golf club for an unlawful purpose. Both the guilty and non-guilty verdicts required unanimity. It thus is apparent the jury unanimously decided both the lamp and knife were possessed for an unlawful purpose, that is, to kill Doody.

Finally, it bears repeating that defense counsel did not request a specific unanimity instruction but rather consented to the general unanimity instruction after a charge conference. Accordingly, "there is a presumption that the charge was not error and was unlikely to prejudice . . . defendant's case." <u>Montalvo</u>, 229 N.J. at 320.

C.

The jury in this case was presented with the option to convict for lesser forms of homicide than knowing/purposeful murder that was charged in the indictment. Specifically, the jury was instructed on the lesser offenses of aggravated manslaughter, N.J.S.A. 2C:11-4(c), reckless manslaughter, N.J.S.A. 11-4(b)(1), and passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2). Defendant now contends the trial court committed plain error by failing to instruct the jury that self-defense could apply to the manslaughter offenses and not just to the murder charge. Viewing the jury instructions as a whole, we reject defendant's contention.

In State v. Rodriguez, our Supreme Court made clear that when there is sufficient evidence to warrant a self-defense charge, the defense applies to aggravated manslaughter and manslaughter as well as murder. 195 N.J. 165, 172–74 (2008). The trial court in the present case instructed the jury on self-defense immediately after charging the jury first on murder and then manslaughter. In delivering the self-defense instruction, the trial court did not specifically mention aggravated manslaughter, reckless manslaughter, or passion/provocation manslaughter, nor did the court instruct the jury that self-defense does not apply to those lesser forms of homicide.

28

It bears emphasis this is not a situation where the judge instructed the jury on murder and then instructed the jury on self-defense before proceeding to instruct the jury on the manslaughter offenses. Even absent an explicit reference to manslaughter when explaining the principles of self-defense, the structure and sequence of the jury instructions implies that the defense of use of force for self-protection applies to all of the homicide offenses the jury had been instructed to consider.

The present situation is very different from the one in State v. O'Neil, 219 N.J. 598 (2014), which resulted in the reversal of that defendant's conviction.[2] In O'Neil, the trial judge instructed the jury that self-defense is a valid justification for murder but expressly told the jury this defense did not apply to aggravated manslaughter or manslaughter. Id. at 617. The jury acquitted the defendant of murder and convicted him of aggravated manslaughter. The Supreme Court concluded that the erroneous jury instruction necessarily undermined confidence in the verdict. Ibid. (citing Strickland v. Washington, 466 U.S. 668, 694 (1984); State v. Fritz, 105 N.J. 42, 52 (1987)).

---

[2] O'Neil was a post-conviction relief (PCR) case. Rodriguez was decided after O'Neil was tried but before his direct appeal was heard. The trial court had relied on prior precedent—which was rejected in Rodriguez—that suggested self-defense does not apply to manslaughter. The Court in O'Neil found that defendant's appellate counsel rendered ineffective assistance warranting a new trial by failing to raise the jury instruction issue on direct appeal.

In the present case, the trial court did not affirmatively instruct the jury that self-defense does not apply to manslaughter as in O'Neil. To the contrary, the court later in the jury charge noted that self-defense applies to the lesser forms of homicide. Specifically, when explaining how self-defense applies to the counts charging possession of a weapon for an unlawful purpose, the trial court told the jury,

> Earlier in the charge I instructed you on the concept of self-defense <u>as it applies to the offenses of murder, passion/provocation [manslaughter], aggravated manslaughter, and reckless manslaughter</u>. The concept of self-defense as it applies to those offenses is different than that of [the] protective purpose that applies to . . . these counts of the indictment. And when applied to those offenses, self-defense requires the defendant to have an honest and a reasonable belief in the need to use force.

> [(emphasis added).]

As we have noted, "[i]n determining whether a charge was erroneous, the charge must be read as a whole." Jordan, 147 N.J. at 422. We add that defense counsel in his summation stated repeatedly that self-defense applied to all the homicide charges. The absence of an objection to the jury charge on self-defense—which was read verbatim from the written instructions accepted by counsel at the charge conference—suggests counsel did not believe the charge as given undermined his summation. The plain error standard is demanding and

30

aims to "provide[] a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error." Bueso, 225 N.J. at 203.

Finally, we note the jury found defendant guilty of murder, rejecting his self-defense claim. This situation is markedly different from O'Neil, where the defendant was acquitted of murder but convicted of manslaughter. 219 N.J. at 617. Considering all of these circumstances, we conclude the trial court's self-defense instructions in this case did not have the capacity to produce an unjust result.

III.

Defendant contends the trial court erred in precluding the expert testimony of John Brick, Ph.D., regarding the measurement, consumption, and biobehavioral effects of alcohol. Defendant also contends the trial court erred in denying his motion for a new trial based on the exclusion of Dr. Brick's testimony. We reject both contentions.

We begin our analysis by acknowledging the legal principles governing the admission of expert testimony. N.J.R.E. 702 provides, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto

31

in the form of an opinion or otherwise." There are three prerequisites for the admission of expert testimony: first, "the intended testimony must concern a subject matter that is beyond the ken of the average juror"; second, "the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable"; and third, "the witness must have sufficient expertise to offer the intended testimony." State v. Jenewicz, 193 N.J. 440, 454 (2008).

Furthermore, an expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Davis v. Brickman Landscaping, 219 N.J. 395, 410 (2014) (quoting Pomerantz Paper Corp. v. New Comm. Corp., 207 N.J. 344, 372 (2011)). A conclusion unsupported by facts or reliable data is a "net opinion" that must be excluded. Pomerantz, 207 N.J. at 372. An expert may not testify to a conclusion devoid of objective support, based on unfounded speculation or unquantified possibilities, or which references a standard that is personal to the expert. Davis, 219 N.J. at 410; Taylor v. DeLosso, 319 N.J. Super. 174, 180 (App. Div. 1999); Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997).

The scope of our review on appeal is limited. "Ordinarily, the necessity for and admissibility of expert testimony are matters to be determined within the sound discretion by the trial court." State v. Berry, 140 N.J. 280, 293 (1995) (citing State v. Zola, 112 N.J. 384, 414 (1988)); see also State v. Kelly, 97 N.J.

178, 216 (1984) (noting generally that "[i]n the context of an appellate review, a decision of the trial court [regarding admissibility of expert testimony] must stand unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted") (citations omitted).

We next apply these general principles to the proposed expert testimony of Dr. Brick. The defense retained Brick, an alcohol-drug expert, for the purposes of explaining Doody's .252% BAC and identifying any scientific research suggesting a relationship between the consumption of alcohol and aggressive behavior. The defense theorized that Doody's elevated BAC was relevant in determining whether he was the initial aggressor, and whether defendant used appropriate force in response.

In his report, Brick opined that a .252% BAC would likely have made Doody "highly intoxicated and impaired" at or about the time of his death. Brick then asserted:

> Alcohol, more than any other drug, is found in victims and perpetrators of assaults and other crimes of violence and is the subject of psychosocial research and forensic investigations. The causal relationship between intoxication and aggression is widely reported through qualitative and quantitative research demonstrating that intoxication can increase aggression escalated [sic] violent behavior. However, the nexus between intoxication and aggression (or violence) is

33

complex, situational and subject dependent (e.g., most people who drink do not become violent)[,] and explained by different models of human behavior. Nevertheless, high rates of alcohol involvement among fight-related homicide victims and a substantial portion of perpetrators who are under the influence of alcohol are consistent with the hypothesis that alcohol increases aggression.

Brick further noted that a number of "models" had "been proposed to disentangle the complex web of correlated and causal factors that contribute to the alcohol-aggression relationship." He nonetheless acknowledged, "the interaction between alcohol intoxication and aggressive/violent behavior is complex and influenced by many factors." Brick also acknowledged that alcohol did "not directly change the brain to cause violent behavior in the same way it causes general signs of intoxication."

Brick ultimately concluded "it is my opinion that Richard Doody voluntarily consumed a large quantity of alcohol prior to his death. As a result of Mr. Doody's consumption, he became intoxicated and impaired and at increased risk for a variety of injuries due to state of intoxication."

Prior to trial the State moved to preclude defendant from arguing a defense of "alcohol causation" and to bar defendant from introducing expert evidence from Brick consistent with his report. Following oral argument, the trial court

34

granted the State's motion, rendering a thorough and detailed oral opinion.  The

trial court found:

> The defense argument does not appear to be grounded
> in known facts in the instant matter.  There is no fact
> before the [c]ourt that would suggest that Mr. Doody
> was the initial aggressor in this case.  Furthermore,
> there is no discussion at all by Dr. Brick regarding Mr.
> Doody's level of intoxication as it relates to aggression.
> Dr. Brick does talk about general biobehavioral effects
> of alcohol, for example, impaired cognition,
> perception, and psychomotor performance as well as
> [de]creased inhibition. . . .  But when he speaks about
> the links to aggression, he refers to the nexus between
> intoxication and aggression as being "complex,
> situational and subject-dependent, and notes that most
> people who drink do not become violent."

The court continued:

> [Dr. Brick] also states that the alcohol does not directly
> change the brain to cause violence in the same way that
> it does to cause what he calls "the general signs of
> intoxication."   In other words, aggression, unlike
> impaired cognition, psychomotor skills, inhibitions[,]
> or perceptions is not a general effect of intoxication.
> Dr. Brick does not name any definitive way to measure
> alcohol's effect on violent or aggressive behavior or any
> one model that conclusively explains it.
>
> Without any facts to suggest that Mr. Doody was the
> initial aggressor in this case, Dr. Brick's testimony
> would have very limited probative value as to the issue
> of self-defense, would be confusing to the jurors[,] and
> would be highly prejudicial to the State.  Likewise, Dr.
> Brick's report would also constitute a net opinion as he
> does not provide the why and the wherefore for
> injecting the alcohol aggression link into the case.  In

35

fact, he specifically disassociates aggression from the other general effects of alcohol by stating that alcohol does not directly change the brain to cause violent behavior in the same way that it causes general signs of intoxication.

It can be inferred then that any discussion of general biobehavioral effects of alcohol would not include a discussion of aggression . . . .

There is no dispute that Mr. Doody was highly intoxicated at the time of his death. His actual BAC becomes irrelevant, however, if it cannot be linked to specific aggressive behaviors that would have caused the defendant to respond with appropriate force. Presently there are no facts before the [c]ourt. To allow Dr. Brick to discuss the intoxication-aggression link without supportive facts . . . would be so inherently inflammatory as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the case.

In reaching its decision, the trial court took into account statements Murray made to police at the outset of the investigation and later to the prosecutor. Specifically, Murray told police that Doody could be "belligerent" when drunk. She explained that if she told him to do something, he would do the opposite. She told the prosecutor that if she told him to stop drinking, he would open a beer right in front of her. She later clarified she thought "belligerent" meant heavily intoxicated, and that Doody "would never become hostile or aggressive whether [drunk] or sober."

A-5252-18

Murray also told police that Doody had never struck her, although she recalled one instance between 1980 and 1985 when Doody grabbed her arm, prompting her to strike him in response. She could not remember if he was drunk at the time and claimed that there had been no similar incidents since.

Defendant now argues the trial court erred in ruling that Brick's expert opinion was a net opinion. Defendant contends he should have been permitted to "flesh out that it is more likely that an individual who has consumed an excessive amount of alcohol would be the initial aggressor." He maintains that Brick's expert opinion testimony would have offered a scientific foundation for his self-defense claim and was "essential for the jury to make the self-defense determination."

We agree with the trial court that there was no factual support for the claim that Doody was the initial aggressor. We also agree with the trial court that Brick's report did not set forth a definitive scientific model explaining the relationship between alcohol and aggression. Rather, Brick acknowledged that: (1) the relationship between alcohol and aggression was "complex, situational and subject dependent"; (2) alcohol did not cause brain changes resulting in violent behavior, although it did cause changes resulting in the general signs of intoxication; and (3) most people who drink did not become aggressive.

37

Given that all of the experts agreed that Doody was struck, stabbed, and slashed while seated, and Brick was only able to conclude that Doody's intoxication put him "at increased risk for a variety of injuries due to state of intoxication," we find the trial court did not abuse its discretion in precluding Brick from offering speculation that Doody was the initial aggressor because of his BAC. We therefore reject defendant's contentions that the trial court erred in precluding Brick's testimony and in denying his motion for a new trial on this ground.

IV.

We turn next to defendant's contention the trial court erred in precluding Detective Scott Eelman from testifying for the defense as an expert witness in accordance with his September 13, 2018 report. In that report, Eelman opined that defendant and Doody engaged in a "big fight" in which defendant struck Doody with a golf club, Doody subsequently tripped over the coffee table, fell on the ceramic lamp causing lacerations to his neck, and then tumbled into the recliner.

In November 2018, the State moved to preclude the testimony of Eelman based on his report, arguing that Eelman did not have sufficient expertise in bloodstain analysis and crime scene reconstruction. The State also argued that

A-5252-18

Eelman's opinions were speculative and founded on inadmissible hearsay evidence.

Defense counsel did not file opposition papers. Counsel instead wrote to the court advising that he would not be opposing the State's motion to bar Eelman's testimony. However, counsel reserved the right to reopen the issue of the admissibility of Eelman's testimony if he was unsuccessful in barring the testimony of Detective John Garkowski, whom counsel claimed had identical credentials to Eelman. The trial court thereupon granted the State's pretrial motion to bar Eelman's testimony.

On January 17, 2019, the trial court denied defendant's motion to bar Garkowski's testimony. Defense counsel thereafter obtained a new report from Eelman dated February 15, 2019. Counsel then filed a motion for reconsideration of the order excluding Eelman's testimony and seeking permission for Eelman to testify in accordance with his new report.

In this new report, Eelman critiqued Garkowski's findings. He agreed with Garkowski that: (1) Doody was seated while being struck in the head; (2) Doody remained in the chair long enough for the blood flow patterns to fix; (3) a bit of ceramic was affixed to the back of the chair by dried blood; (4) there was lividity in the bottom of Doody's foot, and he was seated at the time lividity set in and fixed; and (5) Doody was moved afterward. However, Eelman

maintained that Doody also may have sustained other injuries to the head before he was seated in the chair, and that Doody's throat laceration was caused by the lamp instead of the knife. He also disagreed with Garkowski that it was possible to ascertain the measurements of the blunt force weapon, that Doody was in a defensive position, and that the handprints on the chair arms did not come from Doody.

The trial court denied defendant's motion for reconsideration regarding Eelman's initial report but granted defendant's motion to permit Eelman to testify in accordance with his subsequent report.[3] The trial court rendered an eleven-page written opinion detailing its reasoning for barring testimony based upon Eelman's initial report. The court found the credentials of Garkowski and Eelman "vastly different," noting that Garkowski held an associate's degree in criminal justice and had testified as an expert in five counties in New Jersey. Eelman, in contrast, was only a high school graduate and had never testified as an expert outside of his local county in Pennsylvania. After reviewing and commenting on each of Eelman's opinions, the trial court observed:

> It should be noted that Eelman did not inspect or visit the crime scene. He did not inspect or photograph the evidence. He did not analyze blood patterns, blood

---

[3] Defendant chose ultimately not to call Eelman to give testimony based on his subsequent report. However, defendant did present crime scene reconstruction testimony from Janice Johnson.

40

spatter, or anything else. He merely summarized reports, parroted the opinions of others, and speculated as to what occurred after saying all one could do was speculate. He did what the jurors themselves can do without any expert help or advice. He relied on hearsay evidence involving [defendant's] own declarations. No scientific methodology whatsoever appears to have been applied to any opinions, and none of the opinions expressed in his report were to a reasonable degree of scientific probability.

We agree with the trial court's comprehensive and well-reasoned analysis. Defendant has failed to establish that the trial court abused its discretion in making these detailed findings and conclusions with respect to Eelman's initial report. See Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (an abuse of discretion occurs "when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis") (internal quotation marks omitted). To the contrary, the record clearly shows the trial court properly exercised its discretion in excluding testimony concerning Eelman's first report. Moreover, as we have noted, defendant chose not to call Eelman to testify at trial in accordance with his second report, and instead relied on Janice Johnson's expert testimony

V.

Defendant contends the trial court erred in permitting Detective John Garkowski of the Burlington County Prosecutor's Office State to opine that the

41

lividity on the bottom of Doody's right foot was consistent with Doody dying with this foot on the floor. We reject that contention.

Garkowski testified as an expert in the fields of bloodstain and blood spatter analysis and crime scene reconstruction. Prior to preparing his report, Garkowski reviewed the police and autopsy reports, the crime scene and autopsy photos, and personally examined a portion of the ceramic lamp, the lamp shade, the serrated two-prong knife, the victim's shirt, and the broken golf club head.

Defendant filed a pretrial motion seeking to bar Garkowski's testimony. At oral argument, defense counsel told the trial court he was seeking only to preclude Garkowski from testifying as to seven of the twelve conclusions set forth in his report. The trial court ruled that Garkowski was qualified as an expert in bloodstain and blood-spatter analysis and crime scene reconstruction and thus denied defendant's motion to bar his testimony in general. The court convened an N.J.R.E. 104 hearing to determine the parameters of Garkowski's testimony.

At that hearing, defense counsel limited his objections to only two of Garkowski's conclusions: (1) that the lividity on Doody's right foot was consistent with him dying while his floor was on the floor, and (2) that Doody was in a defensive position during a portion of the impact spatter event. Garkowski explained that his training as a crime scene investigator taught him

42

to look for fixed lividity when establishing a victim's time of death, and that in this instance an autopsy photo depicted fixed lividity on the bottom of Doody's right foot. Garkowski explained that blood settles in the lowest parts of the body after death, and this indicated that Doody was seated with his feet down for a period of time. Doody's opinion also was based on the white area, or "blanching," on the side of his right foot that indicated it was in contact with a hard surface and thus did not become suffused with blood.

Following Garkowski's testimony, the trial court barred his defensive position opinion but admitted his lividity opinion. The court thoroughly explained the basis for permitting the lividity testimony, finding: (1) Garkowski relied upon one of the autopsy photos in reaching this conclusion; (2) no special medical training or expertise was needed to identify lividity; (3) Garkowski was very precise in his testimony; and (4) his opinion was consistent with his other unchallenged opinions that Doody was beaten while seated upright in the chair and that he remained in the chair long enough for the blood flow pattern on his head to fix.

Defendant now contends Garkowski's lividity opinion was nothing more than a bare conclusion lacking factual support. We agree with the trial court that Garkowski's opinion had ample factual support. We deem it significant that both Dr. Hood, who testified for the State, and Janice Johnson, who testified for

43

defendant, agreed there was lividity on the bottom of Doody's right foot. Accordingly, the trial court properly exercised its discretion with respect to Garkowski's testimony.

## VI.

Defendant contends he was denied a fair trial based upon multiple incidents of prosecutorial misconduct during summation and that the trial court should have granted his motions for a mistrial and a new trial on this basis.[4] After carefully reviewing the record, we reject these contentions. Viewed both individually and collectively, the prosecutor's remarks during summation afford no basis to overturn the guilty verdicts rendered by the jury.

Before addressing each alleged incident of misconduct, we acknowledge the general legal principles that guide our review. "[A] motion for a mistrial should be granted only in those situations which would otherwise result in manifest injustice." State v. DiRienzo, 53 N.J. 360, 383 (1969). The decision to deny a motion for a mistrial is within the sound discretion of the trial judge

---

[4] Defendant in his appeal brief alleges five incidents of prosecutorial misconduct during summation. In his reply brief, defendant for the first time asserts two additional incidents of prosecutorial misconduct during closing arguments. We choose to address these additional claims, notwithstanding the general rule that a defendant is not permitted to make new arguments in a reply brief. See State v. Smith, 55 N.J. 476, 488 (1970) (a party is not permitted to use a reply brief to enlarge his or her main argument).

and will only be reversed on appeal for abuse of this discretion. State v. Winter, 96 N.J. 640, 647 (1984).

A conviction may be reversed based on prosecutorial misconduct only where the misconduct is so egregious in the context of the trial as a whole as to deprive the defendant of a fair trial. State v. Wakefield, 190 N.J. 397, 435–38 (2007). Although a single instance of prosecutorial misconduct may not be so prejudicial as to warrant reversal, the cumulative effect of several such instances may create such prejudice. State v. Rodriguez, 365 N.J. Super. 38, 49 (App. Div. 2003).

When the alleged misconduct involves a particular remark, a court should consider whether: (1) defense counsel objected in a timely and proper fashion to the remark; (2) the remark was withdrawn promptly; and (3) the court gave the jury a curative instruction. State v. Smith, 212 N.J. 365, 403 (2012); State v. Zola, 112 N.J. 384, 426 (1988).

As a general proposition, if no objection is made to a prosecutor's remarks, those remarks will not be deemed prejudicial. State v. Ramseur, 106 N.J. 123, 323 (1987). The failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial within the atmosphere of the trial. State v. Irving, 114 N.J. 427, 444 (1989). Failure to object also deprives the trial court the opportunity to take corrective action. Ibid. When

prosecutorial misconduct is being raised for the first time on appeal, a reviewing court need only be concerned with whether "the remarks, if improper, substantially prejudiced the defendant['s] fundamental right to have the jury fairly evaluate the merits of [his or her] defense, and thus had a clear capacity to bring about an unjust result."  State v. Johnson, 31 N.J. 489, 510 (1960).

A prosecutor is expected to make a "'vigorous and forceful'" closing argument to the jury.  State v. Lazo, 209 N.J. 9, 29 (2012) (quoting State v. Smith, 167 N.J. 158, 177 (2001)).  A prosecutor may make remarks that constitute legitimate inferences from the facts, provided he or she does not go beyond the facts before the jury.  State v. R.B., 183 N.J. 308, 330 (2005).  A prosecutor may also respond to arguments raised by defense counsel during his or her own summation.  Smith, 212 N.J. at 404; State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001).

A prosecutor may not, however, make arguments contrary to the material known facts in the case, regardless of whether that information has been presented to the jury.  State v. Sexton, 311 N.J. Super. 70, 81 (App. Div. 1999). Additionally, a prosecutor may not, through his or her remarks, shift the burden of proof to the defense.  See State v. Loftin, 146 N.J. 295, 389 (1996).  Nor may a prosecutor draw attention to a defendant's failure to testify.  State v. Engel,

249 N.J. Super. 336, 382 (App. Div. 1991) ("A prosecutor should not either in subtle or obvious fashion draw attention to a defendant's failure to testify.").

A.

Defendant contends the prosecutor improperly shifted the burden of proof to the defense when she commented on the absence of evidence. The particular portions of the prosecutor's summation to which defendant objected[5] read as follows:

> Jan Johnson told you, that backpack, that was in the chair during the event. How can we know that? How can she say that? But what do we have? That BlueStar, that Luminol. She called this a smear. But we know that the victim was in this chair for six to eight hours, and then the victim was dragged out of the chair and placed on the floor. Isn't this evidence more consistent with the victim being in the chair? And then when [defendant] comes back the next day, he drags him out of the chair and places him on the floor.
>
> And then the backpack was put there at some point during the cleanup. How can we know? Does it matter? I submit, not a lot. But what is the evidence showing you?

The prosecutor later stated:

---

[5] Defense counsel did not object during the prosecutor's summation. Rather, counsel moved for a mistrial following the prosecutor's summation. For purposes of this appeal, we deem the objection to be timely. Defendant's motion for a mistrial based on alleged prosecutorial misconduct afforded the trial court the opportunity to issue a curative instruction if deemed necessary and appropriate.

Those prongs [on the knife] matching up to those marks, is that from a struggle? Or from standing over the chair and inflicting those wounds? The drag marks match up. Did you hear any evidence to contradict this? John Garkowski told you the victim was beaten with a blunt force object numerous times while seated in the chair. Jan Johnson agreed.

In response to defense counsel's objection, the court ruled that it understood that the prosecutor was referring to a lack of physical evidence and that it was entirely appropriate for her to make fair comment on the evidence. The court disagreed that defendant was prejudiced by a shifting of the burden of proof.

When defendant renewed this argument as part of his new trial motion, the court ruled that, when considered in context, the prosecutor did not shift the burden of proof but was simply discussing the testimony of the two crime scene experts and noting where they disagreed.

We agree with the trial court that the prosecutor made fair comments on the evidence when discussing the testimony of Garkowski and Johnson. See Loftin, 146 N.J. at 389 (noting "[a]lthough [the prosecutor's] comment could be interpreted as shifting the burden to the defense to disprove the State's allegation, it seems more likely to have been intended as an observation of the strength of the State's case"). We add that the jury was properly instructed that

the burden of proof rests on the State and never shifts to the defendant.[6] See ibid. ("Given the trial court's comprehensive charge explaining the presumption of innocence, that the presumption remains until the State has proven guilt beyond a reasonable doubt, that defendant 'has no burden to come forward with one scintilla of evidence,' and that the burden is on the State 'and that burden never, ever shifts,' we do not find that statement to have denied defendant a fair trial.").

B.

Defendant contends the prosecutor improperly commented upon his failure to take the stand when she argued:

> There must be adequate provocation. What? What is the provocation? We didn't hear anyone testify there was yelling and screaming. Because there were knives in a home where a retired man was by himself most the time, fishing, cooking? The cats weren't even there anymore. Who cares if there were a kitchen knife here or there. What was the provocation? What evidence have you heard, actual evidence of any provocation that it actually impassioned the defendant? It seemed like

---

[6] The trial court instructed the jury as follows:

> The burden of proving each element of a charge beyond a reasonable doubt rests upon the State and that burden never shifts to the defendant. The defendant in a criminal case has no obligation or duty to prove his innocence or offer any proof relating to his innocence . . . . The State has the burden of proving the defendant guilty beyond a reasonable doubt.

49

> he was angry.  But how do you know that?  What
> evidence have you heard to demonstrate that element?

[(emphasis added).]

The trial court found that the prosecutor was pointing out no neighbors testified they heard yelling or screaming at the time the homicide was occurring. The court did not interpret the prosecutor's remarks as a reference to defendant's decision not to testify.

When defendant renewed this argument as part of his new trial motion, the court found that the prosecutor's remark "was not meant to highlight a lack of evidence from the defendant himself, but rather from witnesses who might have heard yelling and screaming."  The court noted the prosecutor's comment was made while she was discussing the offense of passion-provocation manslaughter, and that testimony regarding screaming and yelling is often proffered in passion-provocation cases.  Because the State bore the burden to disprove passion-provocation, the trial court concluded the prosecutor's remarks were fair comment on the evidence.

We are satisfied the trial court did not abuse its discretion when it found that the prosecutor's comment pertained to the lack of testimony from neighbors and not to defendant's election not to testify.  We afford deference to the trial court's feel for the case and in this instance, the trial court's understanding of the

import of the prosecutor's argument as it was being made. We therefore conclude the prosecutor's remarks did not improperly draw attention to defendant's decision not to testify. Engel, 249 N.J. Super. 336 at 382.

C.

Defendant contends the prosecutor impermissibly shifted the burden of proof when she argued to the jury:

> Tampering with physical evidence; that the defendant believed that an official proceeding was about to be instituted. The judge will tell you we can't know what's in a person's head. That knowledge element is often circumstantial. But I submit to you, the actions of this defendant between November 21st and November 25th demonstrate nothing but the fact that he knew this was coming. We've shown that. We can know that. It's inherent in his behavior. This was not the behavior of someone who, in the heat of the moment, created this horrible accident. It was purposeful conduct. And he purposely destroyed, concealed, or removed multiple objects or things from 2204 Central Avenue. The light bulb. The beer bottle. The magnets.
>
> Where is the cellphone? Where is the victim's iPad? We know he removed those physical things. What else did he take? And that his purpose in destroying or concealing them was to impair their availability in the investigation. Again, I point to the victim's phone, the victim's iPad. Wouldn't you like to know? You heard that from the defense. Wouldn't you like to know what was on the victim's phone? What was on the victim's iPad? Me, too. It was taken from the crime scene, I submit to you, the circumstantial evidence overwhelmingly demonstrates, by this defendant. So

that we couldn't know. So that we couldn't see. So that it couldn't be used against him.

[(emphasis added).]

The trial court ruled that the prosecutor's remarks were fair comment on the evidence given that defendant was charged with tampering with evidence and hindering apprehension or prosecution. When defendant renewed this argument as part of his new trial motion, the court again deemed these remarks fair comment on the evidence as they were made in the context of the evidence tampering charge. The trial court reasoned: (1) defendant's cell phone and iPad were missing from the scene of the crime; (2) some other items missing from Doody's home were recovered at defendant's home; and (3) there was evidence that defendant traveled up and down Long Beach Island on November 22, 2015, thus giving him access to a large wildlife preserve at the southern end of the island.

We agree with the trial court that when interpreted in context, the prosecutor was discussing the evidence in support of the tampering charge, not commenting on defendant's failure to testify. Nor did the prosecutor's argument and rhetorical questions somehow shift the burden of proof. We nonetheless note the prosecutor's remark "me too" was inappropriate to the extent she expressed her personal desire to know what information might have been

contained in the victim's missing cell phone and iPad. That fleeting comment, however, affords no basis upon which to overturn defendant's convictions for tampering or for murder. See Ramseur, 106 N.J. at 322–23 ("The prosecutor's misconduct must be viewed in the context of [the entire fourteen-day protracted] trial."); see also Engel, 249 N.J. Super. at 382 ("Viewing the summation as a whole, we cannot fairly say that the prosecutor's errant remark was so egregious as to deny defendants a fair trial.").

D.

Defendant contends the prosecutor misled the jury by improperly commenting on the absence of evidence indicating that Doody was violent, when in fact such evidence had been precluded from trial by the parties' mutual consent. See Sexton, 311 N.J. Super. at 79–81 (precluding a prosecutor from making arguments contrary to the known facts regardless of whether those facts have been presented to the jury).

Specifically, Murray had told police and the prosecutor that sometime between 1980 and 1985, Doody had once grabbed her arm, prompting her to strike him. She claimed there had been no domestic violence incidents since.

During summation, the prosecutor argued:

> Belligerent. What did Virginia Murray tell you she
> meant when she used that word? Don't people often use
> words in not precisely the same way? She said, ["]when

I told him to do something he would do the opposite.["]
That came out in her cross as well. She told you that's
what she meant. Remember her tone and her demeanor
when she testified. Was she hiding something from
you? Did she somehow fabricate an explanation three
and a half years later? Or is that what she meant? Not
that he was violent. <u>What other testimony do we have
of that? Why did this defendant bring such a violent,
aggressive friend two [twelve-]packs of beer and a
bottle of scotch if he was so violent when he was drunk?</u>
No. Ginny said, ["]he didn't listen to me when he was
drinking. He would do the opposite.["] When did she
give that statement. The morning after she learned her
husband's body was found. Forgive her if she didn't use
the exact, precise words. But what makes more sense
here? What is more reasonable?

[(emphasis added).]

The trial court denied defense counsel's objection, ruling that the

prosecutor's comment did not have the capacity to mislead the jury. When

defendant renewed this objection as part of his new trial motion, the trial court

acknowledged that while Murray stated her husband had once "put his hands on

her" sometime between 1980 and 1985, she maintained he had never struck her

during their marriage. The court concluded that the prosecutor's remarks were

fair comments since the parties had agreed prior to trial that there was just one

physical altercation involving Doody and his wife. The trial court further found

that even if the prosecutor's comment was inappropriate, "the slim value of Ms.

Murray's other statement [regarding the 1980–1985 arm-grabbing incident] bel[ies] any contention that defendant was deprived of a fair trial."

We believe the trial court did not abuse its discretion in assessing the impact of the prosecutor's remark regarding the lack of evidence of Doody's violence. We agree the prosecutor's fleeting rhetorical question, "[w]hat other testimony do we have of that," referring to Doody's predisposition to violence when intoxicated, did not deprive defendant of a fair trial. Cf. Ramseur, 106 N.J. at 323 (a prosecutor's misconduct must be viewed in the context of the entire trial).

E.

Defendant next contends, for the first time on appeal, the prosecutor improperly argued Doody sustained "more than" ten blows to the head. Defendant now claims there is no supporting evidence that defendant sustained more than ten blows. The record reflects Dr. Hood testified Doody suffered ten "irregular abraded lacerations to the side of the head." However, the prosecutor took care to tell the jurors that their recollection on this point would control.[7] The failure to object, moreover, clearly indicates to us that this comment was of

_____

[7] We add that the jury was properly instructed that statements made by the attorneys were not to be considered as evidence. See Ramseur, 106 N.J. at 323 (that instruction obviated any lingering potential for undue prejudice).

no moment.  Irving, 114 N.J. at 444.  We are satisfied the prosecutor's remark lacked the capacity to produce an unjust result when viewed in the context of the entire trial.  See Ramseur, 106 N.J. at 323.

F.

The defendant's remaining two allegations of prosecutorial misconduct during summation—not raised below and only raised for the first time in defendant's reply brief, see supra note 4, lack sufficient merit to warrant all but brief discussion in this opinion.  R. 2:11-3(e)(2).  Defendant contends the prosecutor committed misconduct when she argued there was another avenue of escape for defendant to retreat before employing deadly force in self-protection. The prosecutor remarked, "what is just off-screen from this photo?  What is just within reach of, I submit to you, this avenue of exit?  A sliding glass door." Defendant now argues, without citation to the record, this sliding door opened to a balcony fifteen feet above the ground and thus was not a safe exit for purposes of the duty to retreat before employing deadly force, N.J.S.A. 2C:3-4(b)(2)(b).  Even accepting for the sake of argument that defendant is correct as to the balcony, we believe the prosecutor's remarks regarding the sliding glass door, viewed in the context of all the evidence, did not substantially prejudice defendant's fundamental right to have the jury fairly evaluate the merits of his self-defense claim, and thus did not have a clear capacity to bring about an unjust

56

result.  Johnson, 31 N.J. at 510.  Moreover, the trial court's charge to the jury that statements made by the attorneys were not to be considered as evidence obviated any potential for undue prejudice.  See Ramseur, 106 N.J. at 323.

So too we reject defendant's new contention that the prosecutor improperly argued in summation that defendant knew about Doody's "terrible" behavior when Doody was intoxicated, yet brought him alcohol nonetheless. Defendant argues there was no evidence at trial that defendant had any prior knowledge as to Doody's "terrible" behavior and that the prosecutor thus "improperly shifted blame to defendant for bringing alcohol to an individual which he purportedly knew would become 'terrible' (i.e., violent)."  Defendant contends the prosecutor's statement was improper because defendant had no such knowledge.

Defendant's argument fundamentally misconstrues the prosecutor's point. The prosecutor was not suggesting that defendant knew that Doody had a history of terrible behavior while intoxicated.  Rather, the true gist of the prosecutor's argument was that there was no evidence that Doody became physically aggressive when drinking.  We believe it was a fair argument that it was defendant who brought alcohol to Doody's residence and that he would not have done so if he believed it would cause Doody to become violent.  It was a fair inference that defendant knew Doody well, including his social and drinking

habits; Doody was, after all, the best man at defendant's wedding. In these circumstances, we reject defendant's argument that the prosecutor sought to shift blame to defendant for bringing alcohol to someone he knew would become violent.

Finally, with respect to the prosecutor's summation, we reject defendant's contention that the "numerous improprieties by the prosecutor during closing argument violated defendant's due process right to a fair trial." We further address defendant's cumulative error argument in section X of this opinion.

VII.

Defendant next contends the motion court erred in denying his motion to suppress evidence seized from his home and car pursuant to search warrants.[8] We derive the following facts from the affidavit in support of the search warrants and the motion court's sixteen-page, single-spaced written opinion.

On November 25, 2015, Detective Raymond Gardner of the Ocean County Prosecutor's Office submitted affidavits in support of an application for warrants to search defendant's home and Jeep. Gardner's affidavit detailed the police investigation of the homicide. That same day, a Superior Court judge issued the warrants, authorizing police to search defendant's home and car for documents

_____

[8] The suppression motion was heard by a different judge than the one assigned to conduct the trial.

relating to financial transactions and cell phones and other personal communications devices. The warrant provided that police could execute the searches "anytime." Police executed the warrants between 7:00 p.m. and 8:00 p.m. that night.

Defendant contends: (1) the authorization permitting execution of the search warrant for defendant's home at "anytime" violated Rule 3:5-5; (2) the warrant for the search of defendant's home was overly broad with respect to the authorization to seize financial documents; and (3) the affidavit submitted in support of the warrants did not establish probable cause because it failed to show a sufficient nexus between the crime and defendant's home and car.

Because we affirm substantially for the reasons explained in the motion court's thorough and thoughtful written opinion, we need not readdress defendant's arguments at length. We add the following comments. Rule 3:5-3(a) provides in pertinent part:

> An applicant for a search warrant shall appear personally before the judge, who must take the applicant's affidavit or testimony before issuing the warrant. . . If the judge is satisfied that grounds for granting the application exist or that there is probable cause to believe they exist, the judge shall date and issue the warrant identifying the property to be seized, naming or describing the person or place to be searched and specifying the hours when it may be executed . . . .

<u>Rule</u> 3:5-5(a) further provides that "a search warrant . . . must be executed within [ten] days after its issuance and within the hours fixed therein by the judge issuing it, unless for good cause shown the warrant provides for its execution at any time of day or night. . . ."

To be valid, a search warrant "must be based on sufficient specific information to enable a prudent, neutral judicial officer to make an independent determination that there is probable cause to believe that a search would yield evidence of past or present criminal activity." <u>State v. Keyes</u>, 184 N.J. 541, 553 (2005). Probable cause exists where there is "a reasonable ground for belief of guilt" based on facts of which the officers had knowledge and reasonably trustworthy sources. <u>State v. Marshall</u>, 199 N.J. 602, 610 (2009) (quoting <u>State v. O'Neal</u>, 190 N.J. 601, 612 (2007)). Probable cause is a "'common-sense, practical standard' dealing with 'probabilities' and the 'practical considerations of everyday life,'" and is generally understood to mean "'less than legal evidence necessary to convict though more than mere naked suspicion.'" <u>State v. Evers</u>, 175 N.J 355, 381 (2003) (first quoting <u>State v. Sullivan</u>, 169 N.J. 204, 211 (2001), then <u>State v. Mark</u>, 46 N.J. 262, 271 (1966)). In evaluating the sufficiency of the probable cause supporting a search warrant, we review the four corners of the supporting affidavit and the totality of the circumstances

presented therein. Id. at 380. Hearsay alone can provide a sufficient basis for a warrant. State v. Novembrino, 105 N.J. 95, 110 (1987).

"Once issued, '[a] search warrant is presumed to be valid, and defendant bears the burden of demonstrating that the warrant was issued without probable cause or that the search was otherwise unreasonable.'" State v. Chippero, 201 N.J. 14, 26 (2009) (quoting Evers, 175 N.J. at 381). A reviewing court should "'accord substantial deference to the discretionary determination resulting in the issuance of the [search] warrant." Sullivan, 169 N.J. at 211–12 (alteration in original) (quoting State v. Marshall, 123 N.J. 1, 72 (1991). Accordingly, if a reviewing court has any "[d]oubt as to the validity of the warrant," such doubt "should ordinarily be resolved by sustaining the search." Keyes, 184 N.J. at 554 (quoting State v. Jones, 179 N.J. 377, 389 (2004)). Moreover, pursuant to Rule 3:5-7(g), "[i]n the absence of bad faith, no search or seizure made with a search warrant shall be deemed unlawful because of technical insufficiencies or irregularities in the warrant or in the papers or proceedings to obtain it, or in its execution."

The motion court concluded,

> With regard to the use of the "anytime language," the court finds that nothing in the language of R[ule] 3:5-5 seems to indicate that the "good cause reason" for permitting the warrant to be executed at "anytime" needed to be specified in the warrant itself. The State

61

suggested that the "good cause" reason the warrants needed to be executed at "anytime" in this case was because this was a homicide investigation with no identified motive. The court agrees with the State that even if [this reason is insufficient], at most, the "anytime" language would constitute a technical defect which does not necessitate the suppression of evidence. The court finds that pursuant to R[ule] 3:5-7[(g)], [d]efendant . . . has failed to establish or even allude to any bad faith on the part of Detective Gardner or [the warrant judge]. As such, any technical insufficiencies or irregularities in the warrants in this case, including the "anytime" language, do not permit this court to suppress the evidence uncovered as a result of those warrants.

We agree with the motion court's analysis and conclusion. As the motion court further noted, the warrants were executed between 7:00 p.m. and 8:00 p.m. on November 25, 2015, shortly after defendant's arrest. It was reasonable to execute the house search at the same time that defendant was taken into custody.

We also agree with the motion court that the warrants were not overbroad. There was probable cause to believe the financial records sought in the warrant might establish a motive for homicide. We add that in any event, no such records were introduced at trial, rendering the exclusionary remedy superfluous.

Relatedly, there was ample probable cause to seize electronic devices that may have had stored communications between defendant and Doody. We also reject defendant's contention that police exceeded the scope of the warrant by taking a wedding photograph off the wall of defendant's home. That photo

confirmed that defendant and Doody were close friends. We add that defendant at trial did not dispute that Doody served as best man at his wedding.

Finally, we reject defendant's argument the warrants lacked probable cause because there was an insufficient nexus between the homicide at Doody's residence on Long Beach Island and defendant's home and vehicle. The affidavit in support of the warrant application referenced Doody's text message to his wife stating that defendant had invited himself over. The affidavit related that defendant visited Doody on November 21, 2015, and also included information that defendant's Jeep was observed on Long Beach Island that day. We agree with the motion court that it was reasonable to believe the perpetrator of the murder could have transported evidence from the crime scene, and that such evidence might thus be found in the perpetrator's vehicle and residence. Indeed, having established that defendant was staying as a guest at the victim's residence at the time of the homicide, the nexus between the crime and defendant, his vehicle, and his residence is self-evident.

We also reject defendant's contention the probable cause was stale. As a general proposition, the determination whether probable cause is stale depends more on the nature of the unlawful activity alleged in the affidavit than in the date and times specified therein. See State v. Blaurock, 143 N.J. Super. 476, 479 (App. Div. 1976). Although the homicide was an isolated incident for which

probable cause might dwindle rapidly, ibid., the search warrants were obtained less than forty-eight hours after Doody's body was discovered. The police and prosecutor's office were diligent, thorough, and prompt in conducting a labor-intensive homicide investigation that cast suspicion on defendant. That investigation entailed forensic examination of the crime scene, identifying the victim, speaking to the victim's wife, reviewing video footage of defendant's vehicle going to and leaving the victim's residence, surveilling defendant at his residence, and obtaining records for defendant's home and vehicle. While it certainly was possible the perpetrator could have discarded or destroyed inculpatory evidence in the time between the homicide and the issuance of the search warrants, applying the "common sense approach" we embraced in Blaurock, id. at 479–80, probable cause still existed to believe that evidence relevant to the offense, including evidence of motive, would be found in defendant's house and vehicle. The evidence sought in the warrant was not of a type that would dissipate quickly on its own, and we do not view the possibility that the perpetrator might discard or destroy evidence as diminishing the probable cause to believe that defendant was involved in the brutal killing and that evidence of the crime and its aftermath would be found in his possession.

VIII.

Defendant next contends the trial court erred in admitting three autopsy photos. We disagree. In State v. Thompson, our Supreme Court explained, "[i]t has long been the rule in this State that admissibility of photographs of the victim of a crime rests in the discretion of the trial court, and the exercise of its discretion will not be reversed in the absence of a palpable abuse thereof." 59 N.J. 396, 420 (1971); see also State v. Kuropchak, 221 N.J. 368, 385 (2015); State v. Rose, 206 N.J. 141, 157 (2011). Relevant evidence may be excluded if its probative value is substantially outweighed by the risk of undue prejudice or needless presentation of cumulative evidence. N.J.R.E. 403; State v. Feaster, 156 N.J. 1, 83 (1998). In this instance, the trial court carefully considered the probative value of the autopsy photos in relation to the risk of undue prejudice or needless presentation of cumulative evidence.

Prior to Dr. Hood's testimony, the prosecutor advised the trial court there were 187 autopsy photos. The State proposed to show only sixteen of the photos to the jury. Defendant objected to the admission of five of those sixteen. Specifically, defense counsel argued that either photos S-177 or S-178 should be admitted, but not both, as they were cumulative. Counsel argued that S-183 should be excluded as it was too gruesome, and that that either S-184 or S-185

65

should be admitted but not both, as they were cumulative and S-185 was particularly gruesome.

The prosecutor maintained that the photos now at issue should be admitted because the first two offered different views of the injuries to the left side of Doody's head, the third depicted an injury that alone could have caused Doody's death (i.e., the injury to his neck and larynx), and the last two offered different views of two distinct injuries to Doody's skull.

After reviewing the photos, the trial court found that S-177 and S-178 were not cumulative even though they showed the same injury because they provided two distinct views of the injuries to the left side of Doody's head. The court reasoned that S-178 "gives a unique depiction of the injury to the ears, to the left ear rather, which you cannot see in S-177." The court found that S-183, which showed the injury to Doody's larynx, was highly relevant since the nature, depth, and severity of that wound, and the weapon used to make it, were contested. The court also found that S-184 and S-185, which showed the indentations in defendant's skull and damage caused to the brain, were not cumulative as they also were taken from two different angles and were relevant to the issue of the nature, depth, and severity of the blunt force head injuries that were inflicted. In view of the trial court's careful, thorough, and well-articulated

66

analysis, we conclude the court properly exercised its discretion in admitting the autopsy photos.

## IX.

Defendant contends the trial court erred in denying his motion for a judgment of acquittal (JOA) on the charge of murder. He also contends in a separate point that the trial court erred in denying his motion for a new trial because the verdict was against the weight of the evidence. We reject both contentions.

The well-established test for challenging the sufficiency of evidence for a defendant's conviction(s) was articulated in State v. Reyes:

> The question the trial judge must determine is whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [50 N.J. 454, 458–59 (1967).]

See also State v. Martin, 119 N.J. 2, 8 (1990) (quoting State v. Brown, 80 N.J. 587, 592 (1979)) ("In assessing the sufficiency of the evidence, the relevant inquiry is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'") (emphasis in original). The

same standard applies to a motion for a judgment of acquittal notwithstanding the verdict.  State v. Kluber, 130 N.J. Super. 336, 341–42 (App. Div. 1974).

An appellate court will not reverse a trial court's decision on a motion for a new trial "unless it clearly appears that there was a miscarriage of justice under the law."  R. 2:10-1; State v. Labrutto, 114 N.J. 187, 207 (1989).  To this end, the appellate court must make its own determinations, deferring to the trial court only with respect to those intangible aspects of the case such as credibility, witness demeanor, and the general "feel of the case."  State v. Brown, 118 N.J. 595, 604 (1990) (quoting State v. Sims, 65 N.J. 359, 373 (1974)).

After the State rested its case, defendant moved for a JOA on the murder charge, arguing that the State had not met its burden of proof.  The trial court denied the motion, finding that there was sufficient evidence for the case to go to the jury, emphasizing in particular the testimony of Garkowski and Dr. Hood, as well as the "inordinate number of injuries sustained" by Doody.

Prior to sentencing, defendant moved for a new trial, arguing:  (1) there were no witnesses to the fatal incident; (2) he and Doody were friends; (3) Doody had a BAC of .252% and had been described as "belligerent" when drunk; and (4) the absence of defendant's DNA on the handle of the knife "rais[ed] a reasonable doubt as to whether or not defendant maintained control over the subject weapon."

The trial court rejected these arguments, finding that defendant's decision to bring an assortment of alcoholic beverages to Doody's house indicated that he did not believe that Doody was belligerent. The court also found the State had proven beyond a reasonable doubt that defendant controlled the knife and had not acted in self-defense. The court noted that the knife was found partially washed in the sink. The court also stressed that Doody was seated during and after the attack, Doody sustained brutal wounds, and the knife was the second weapon used to inflict injury.

Defendant now contends the State did not disprove his claim of self-defense, that Garkowski was biased in favor of the prosecution, that the police erroneously identified defendant's car a few times from traffic camera footage, and that the absence of defendant's DNA on the knife handle was definitive proof that defendant did not attack Doody. With the exception of the self-defense claim, these contentions lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Based on our own review of the record, we agree with the trial court there was a wealth of evidence that defendant—who did not deny killing Doody—was the aggressor. We note in particular the expert testimony that Doody was seated when he was beaten and then slashed across the neck; the severity of Doody's injuries and the fact that they were inflicted successively with two different

69

weapons; and the evidence that defendant sustained only minor injuries during the violent confrontation. In view of this overwhelming evidence, a reasonable jury could find beyond a reasonable doubt that defendant had not acted in self-defense when he killed Doody.

X.

Finally, we address defendant's contention the alleged trial errors, when considered cumulatively, warrant a reversal of his convictions and a remand for a new trial. In State v. Reddish, our Supreme Court acknowledged that "although an error or series of errors might not individually amount to plain error, in combination they can cast sufficient doubt upon the verdict to warrant reversal." 181 N.J. 553, 615 (2004). In State v. Weaver, the Supreme Court granted a new trial after concluding that it was "a classic case of several errors, none of which may have independently required a reversal and new trial, but which in combination dictate[d] a new trial." 219 N.J. 131, 162 (2014); see also Jenewicz, 193 N.J. at 473–74 (recognizing that even when individual errors do not amount to reversible error, their cumulative effect can require reversal if they "prejudice the fairness of [the] defendant's trial and, therefore, cast[] doubt on the propriety of the jury verdict that was the product of that trial").

In State v. Orecchio, the Court stressed that "the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make

70

the proceedings unfair, may [not] be invoked to upset an otherwise valid conviction." 16 N.J. 125, 129 (1954). Moreover, it is well-settled that "[a] defendant is entitled to a fair trial but not a perfect one." Marshall, 123 N.J. at 170 (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).

In addition to the alleged errors we have already addressed, defendant in his cumulative-error point heading identifies two additional issues not raised before the trial court. We need only briefly address these two additional alleged errors.

During her testimony, Murray made two comments indicating that Doody—a retired New York City firefighter—suffered adverse effects from the terrorist attack on September 11, 2001. Specifically, Murray related that Doody needed a CAT scan of his lungs because of ground glass opacity related to 9/11. During re-direct examination, Murray related that after maintaining his sobriety for a number of years, Doody "started drinking after 9/11." These two comments were inadvertently elicited by the prosecutor, who had instructed Murray not to mention Doody's service on 9/11. After Murray left the stand, defense counsel noted that she had been instructed by the court not to speak of 9/11, and that her testimony came "very close to [violating] the judge's instruction." Defense counsel declined to seek a curative jury instruction but did ask that the prosecutor avoid the topic in her closing. The prosecutor noted that her

questions were not designed to elicit this testimony, and stated that she did not intend to mention 9/11 in her summation. There was no further mention of 9/11 at trial.

Defendant also notes a partial statement Dr. Hood made that decomposition of a body "can produce some ethanol as well, but not a whole lot, so it is likely that [Doody's] blood ethanol level at the time of—." Defense counsel's timely objection prevented Hood from completing his thought, and the court accordingly instructed the jury to disregard that statement and focus only on Hood's testimony that Doody's BAC was .252%.

After carefully considering all of the trial errors defendant alleges on appeal, we conclude that defendant received a fair trial and that none of defendant's contentions, viewed individually or collectively, cast doubt upon the verdict. Reddish, 181 N.J. at 615. We stress that while defendant may not have received a perfect trial, he received a fair one. Marshall, 123 N.J. at 170. We add the State presented overwhelming evidence to disprove beyond a reasonable doubt that defendant was justified in using deadly force in self-defense.

To the extent we have not addressed them, any remaining arguments raised by defendant on appeal lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

72

A-5252-18